# Illinois Official Reports

## Appellate Court

---

*Powell v. Dean Foods Co.*, 2013 IL App (1st) 082513-B

---

| | |
|---|---|
| Appellate Court Caption | TRACEY POWELL, Individually and as Special Administrator of the Estate of Adam McDonald, Deceased; GEORGE KAKIDAS, Individually and as Special Administrator of the Estate of Diana Kakidas, Deceased; and ALEXANDER CHAKONAS, as Special Administrator of the Estate of Christina Chakonas, Deceased, Plaintiffs-Appellees, v. DEAN FOODS COMPANY, ALCO OF WISCONSIN, INC., and JAIME L. REEVES, Defendants-Appellants. |
| District & No. | First District, Fifth Division<br>Docket Nos. 1-08-2513, 1-08-2554 cons. |
| Opinion filed<br>Modified upon<br>denial of rehearing | June 28, 2013<br><br>March 14, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The judgment for plaintiffs in a fatal collision that occurred when plaintiffs' car collided with defendants' tractor-trailer while turning onto a preferential highway was reversed and the cause was remanded for a new trial, where the trial court improperly admitted evidence of the truck driver's prior bad acts, including speeding, log violations and a prior fine, abused its discretion in giving the careful habits instruction as to the driver of plaintiffs' car and in failing to give an instruction of the burden of proof in connection with the agency relationship between the trucking company and the dairy whose products the company was delivering. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 03-L-15077, 03-L-16261; the Hon. Patricia Banks, Judge, presiding. |

| | |
|---|---|
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James K. Horstman and Ronald L. Wisniewski, both of Cray Huber Horstman Heil & VanAusdal LLC, of Chicago, for appellants Alco of Wisconsin, Inc., Alder Group, Inc., and Jaime L. Reeves. |
| | Hugh C. Griffin and Stevie A. Starnes, both of Hall Prangle & Schoonveld, LLC, of Chicago, for appellant Dean Foods Company. |
| | William J. Harte, Ltd. (William J. Harte and Joan M. Mannix, of counsel), and Healy Law Firm (Martin J. Healy, Jr., David P. Huber, and Dennis M. Lynch, of counsel), both of Chicago, for appellees Tracey Powell and George Kakidas. |
| | Muldoon & Muldoon LLC (Michael K. Muldoon and John J. Muldoon III, of counsel), and Michael W. Rathsack, both of Chicago, for appellee Alexander Chakonas. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion. Justice Palmer specially concurred, with opinion. Justice Gordon dissented, with opinion. |

**OPINION**

¶ 1    In July 2002, Adam McDonald, Diana Kakidas and Christina Chakonas were tragically killed when a tractor-trailer driven by defendant Jaime L. Reeves struck their vehicle at an intersection in Wanatah, Indiana. Plaintiffs, Tracey Powell, individually and as special administrator of the estate of Adam McDonald, deceased; George Kakidas, individually and as special administrator of the estate of Diana Kakidas, deceased; and Alexander Chakonas, as special administrator of the estate of Christina Chakonas, deceased, filed wrongful death actions against defendants Reeves; Dean Foods Company (Dean Foods), the owner of the trailer; Alco of Wisconsin, Inc. (Alco), Reeves' employer; and Alder Group, Inc. (Alder), owner of the tractor. Following a trial, the jury returned a verdict in favor of plaintiffs, finding defendants jointly and severally liable, and awarded $8 million to the McDonald estate, $8 million to the Kakidas estate, and $7 million to the Chakonas estate. In a special interrogatory,

the jury also found that Christina Chakonas was 40% contributorily negligent in causing the collision and reduced the award to the Chakonas estate accordingly to $4.2 million.

¶ 2 Defendants raise several issues on appeal: (1) the trial court erred in denying Alder's motion for a substitution of judge; (2) the trial court erred in denying their motions for judgment notwithstanding the verdict and a new trial because the sole proximate cause of the accident was Christina Chakonas driving into the right-of-way of Reeves' tractor-trailer; (3) the jury's allocation of only 40% of the causative fault to Christina Chakonas was against the manifest weight of the evidence; (4) the trial court abused its discretion by allowing evidence of defendants Reeves', Alco's and Alder's prior bad acts; (5) the trial court abused its discretion in giving the "careful habits" jury instruction (Illinois Pattern Jury Instructions, Civil, No. 10.08 (2006)) (hereinafter, IPI Civil (2006) No. 10.08) with respect to the conduct of Christina Chakonas; and (6) the amount of the monetary awards by the jury does not bear a reasonable relationship to the recoverable pecuniary damages proved at trial.

¶ 3 Dean Foods presents the following additional issues on appeal: (1) Dean Foods was entitled to judgment notwithstanding the verdict on plaintiffs' claims for agency and joint venture; (2) the claims against Dean Foods by plaintiffs Powell and Kakidas were barred by the statute of limitations; (3) the jury's finding that Reeves was acting as an agent and/or joint venturer of Dean Foods at the time of the accident is contrary to the manifest weight of the evidence; and (4) the trial court erred in failing to instruct the jury on the burden of proof applicable to plaintiffs' agency and joint venture claims.

¶ 4 We are reviewing this case for a second time following a remand by the Illinois Supreme Court. In a prior opinion, we considered defendants' argument that the trial court erred in denying Alder's motion for substitution of judge as a matter of right, and we agreed with defendants and vacated all orders subsequent to the improper denial and remanded for a new trial before a new trial judge. See *Powell v. Dean Foods Co.*, 405 Ill. App. 3d 354 (2010). The Illinois Supreme Court granted the petition for leave to appeal. Before the supreme court, plaintiffs filed a joint motion to dismiss Alder with prejudice. The supreme court granted the motion to dismiss and concluded that the remaining defendants, Reeves, Alco and Dean Foods, lacked standing to appeal the denial of Alder's motion for substitution of judge as a matter of right. The supreme court vacated our prior decision and remanded the case to this court to consider the remaining issues raised on appeal. *Powell v. Dean Foods Co.*, 2012 IL 111714. Alder is no longer a party to this appeal.[1]

¶ 5 Before addressing the issues presented on appeal, we set out the relevant facts.

¶ 6 On July 6, 2002, Adam McDonald and Diana Kakidas were passengers in a 2002 Pontiac Grand Am automobile driven by Christina Chakonas. All three occupants of the Chakonas vehicle were killed when a tractor-trailer driven by defendant Jaime L. Reeves, hauling 80,000 pounds of Dean Foods milk product, collided with the Chakonas vehicle. The tractor-trailer collided with the Chakonas vehicle as the Chakonas vehicle crossed the eastbound lanes of traffic on Route 30, in the process of turning left into the westbound lanes of Route 30, at the intersection of Route 30 and Lincoln Street in Wanatah, Indiana.

---

[1]Although Alder is no longer a party, the discussion of the issues and evidence reference them as necessary for our analysis.

¶ 7    Two actions were filed in the circuit court of Cook County as a result of the fatal collision. In December 2003, plaintiff Chakonas filed his original complaint which was assigned case No. 03 L 15077, and named Reeves; Alco, Inc.; Alco of Wisconsin, Inc., d/b/a/ Robert Alder & Sons; and Dean Foods as defendants.[2] In July 2004, plaintiff Chakonas filed an amended complaint, naming Reeves; Alco, Inc.; Alco of Wisconsin, Inc.; Dean Foods; and Dean Illinois Dairies, LLC, as defendants.

¶ 8    Also in December 2003, plaintiffs Powell and Kakidas filed their original complaint, assigned case No. 03 L 16261, naming only Reeves and Dean Foods as defendants. In July 2004, plaintiffs Powell and Kakidas filed an amended complaint, naming Reeves; Alco of Wisconsin, Inc.; Alder Group; and Dean Illinois Dairies, LLC, as defendants. In August 2004, plaintiff Chakonas filed a motion to consolidate the Chakonas and Powell/Kakidas actions, which the trial court granted in September 2004. In October 2007, immediately prior to the start of the trial, plaintiffs Powell and Kakidas moved for leave to file a second amended complaint, naming Dean Illinois Dairies, LLC, Dean Foods, Alco, Alder and Reeves. The trial court granted the motion.

¶ 9    Jaime Reeves was called as an adverse party witness by plaintiffs Powell and Kakidas. Reeves testified that he was a full-time truck driver employed by Alco. Reeves stated that July 6, 2002, was a Saturday. His log showed that he finished work the previous day at 1 a.m. on July 6 and he had driven 347 miles. At 9 a.m. on July 6, Reeves drove from his house to a facility in Chemung, Illinois, which was approximately 45 miles away. Reeves then drove to Richland Center, Wisconsin, approximately 135 miles away. At the Richland Center facility, he "dropped the trailer and hooked to another one," which took 15 minutes. He then drove back to Chemung. His next load was not known at that time and he was off duty from 3 p.m. to 7:45 p.m. He did not drive the truck during that period of time. His next destination was Rochester, Indiana, to which he was en route at the time of the accident.

¶ 10    Route 30 is a four-lane, divided highway. Reeves stated that the speed limit was 55 miles per hour until Wanatah, Indiana. He had driven this route many times in the past. Reeves stated that he did not recall his speed and could not remember if he used the cruise control. Reeves said he remembered seeing the signs prior to Wanatah, reducing the speed limit to 40 miles per hour. Reeves said he was not tired or fatigued at the time of the accident.

¶ 11    Reeves testified that the accident occurred between 10 and 10:30 p.m. His truck headlights and running lights were turned on. He stated that he slowed down as he approached Wanatah by taking his foot off of the accelerator and using the engine brake. He said he had to slow down gradually and not "slam" on the brakes because he was carrying a full load of milk in gallon jugs and that could make the truck "hard to control." Reeves said he was driving east and the weather was dry and clear with slightly heavier traffic than normal. When asked to describe his speed as he approached the intersection where the accident occurred, Reeves stated that he was "slowing down with the flow of the traffic." He was not watching his speedometer, but he estimated that he was traveling "between 40 and 45 [miles per hour]." He said that he told people at the scene of the accident the same speed estimate.

¶ 12    Reeves described the circumstances of the accident as follows:

_____

[2]Before the trial court, the parties agreed that Alco, Inc., is a former name of Alco of Wisconsin, Inc., which we shall refer to as "Alco" for this decision.

- 4 -

"As I was approaching Lincoln Street there was a pickup turning right onto Lincoln Street to head south. And there was a vehicle that pulled out right–right in front of me that was going to go west onto Route 30. And then–and then another vehicle just followed right out of nowhere like a deer. It came out of nowhere. It was there."

¶ 13 Reeves testified that he "collided with the second vehicle." He said he "was on the brakes and we eventually stopped aways [*sic*] down the road" after his truck made contact. According to Reeves, his brakes were applied before he struck the vehicle.

¶ 14 When asked if he also worked for Alder, Reeves stated that Alco was part of Alder. Alco scheduled his trips, including the determination of how long the trip would be and how many stops Reeves would make, and had the responsibility of being aware of the "70-hour rule." Plaintiffs' counsel summarized the "70-hour rule" as driving "70 hours during the course of an eight-day period." Reeves confirmed the description, stating that the rule comes from the federal government.

¶ 15 Reeves was asked questions about the Alder driver's manual. Specifically, counsel inquired about paragraphs referring to Dean Foods, noting that the manual provides that "through your actions and from your general appearance these people will form their opinions of Dean's Foods Company," "your job and the future of Alder's and Dean's Food Company depends largely upon good public relations," and "keep smiling and driving with continuing pride in the job you perform as you roll along as part of the blue-and-white Dean fleet." Reeves agreed that the manual contained those statements. Reeves was asked if he was a representative of Dean Foods when driving the truck and Reeves answered that "it would appear so, yes." Reeves also testified that his truck had multiple Dean Foods emblems and lettering for Alco.

¶ 16 He described his job as delivering "dairy products from point A to point B." He said he "would routinely pull out of Chemung, Illinois, go to Rochester, Indiana, [and] go to Richland Center, Wisconsin." According to Reeves, no one from Dean Foods told him how to do his job. On July 6, 2002, Alco told Reeves to start the trip; he had no contact with Dean Foods.

¶ 17 Reeves was questioned about his logbooks for his time on the road. He stated that he completed weekly trip tickets, but he did not know what happened to the trip ticket for the week ending July 6, 2002, the night of the accident. The purpose of his trip tickets was to keep track of his stops, the miles driven in each state, and the fuel put into the truck. He maintained the logbook with his trip tickets in his truck.

¶ 18 When Reeves was asked if his logbooks had been audited by the federal motor carrier compliance inspector in June 2002, defense counsel made a continuing objection, which the trial court overruled. Reeves testified that he did not know when the audit took place, but the company had been audited. When asked if "it was determined by the federal government that [he] had falsified [his] logs," Reeves answered that he "had made some mistakes on them." He was not sure if the finding used the word "falsified." Reeves testified that Alco was fined, but "they didn't get the fine *** just because of me." Additionally, Reeves stated that he was not disciplined, but was shown what he was doing wrong in his logbooks so he "wouldn't do it again." Reeves denied that he intentionally wrote incorrect information in the logbooks. He testified that he "was writing stuff down wrong." He learned how to do it correctly after the audit.

¶ 19    Robert Youngreen testified that on July 6, 2002, he was driving his Dodge pickup truck east on Route 30 with Reeves' truck behind him, approaching Wanatah. When asked if he was driving "a little over 55 miles per hour," Youngreen answered, "probably right in there, yeah." He could clearly see the truck in his rearview mirror. As he entered the Wanatah city limits, Youngreen agreed that he was driving about 40 or 45 miles per hour. Youngreen stated that the truck never passed him on Route 30. Youngreen did not see the truck change lanes.

¶ 20    According to Youngreen, as he approached Lincoln Street, he slowed down to make a right turn. He stated that the right turn lane was "not very long." As he slowed to make the turn, he saw one car cross Route 30 to make a left turn as he was "just coming to the turn lane." Youngreen stated that the first vehicle pulled into the intersection when he was about 100 feet away. He also saw a white car stopped at the stop sign on Lincoln, but he did not see the car move into the intersection. Youngreen made the right turn and then heard what he described as a tire exploding and then "a bunch of debris hit our pickup." Youngreen stated that he was going slow, because it was a sharp corner. He looked back and saw sparks. He turned around and went back to the intersection, where he saw that sparks were coming from the front of the truck.

¶ 21    Christian Reid and Stephanie Solma testified that they were friends of McDonald, Chakonas and Kakidas. On July 6, 2002, the group of Reid, Solma, McDonald, Chakonas and Kakidas decided to go to a local dance club. They went in two cars with Reid driving one car with Solma as a passenger and Chakonas driving the second car with passengers, Kakidas and McDonald. Reid stated that Chakonas knew where the dance club was and there was no plan that she had to follow him.

¶ 22    Reid was driving on Lincoln and stopped at the intersection with Route 30. He made a left turn onto westbound Route 30 and as he was making the turn he stopped in the median to check the traffic headed west. When Reid was turning onto Route 30, Solma looked back to see if Chakonas' car was behind them and she saw that it was stopped at the stop sign. While he was driving, Reid was looking in his rearview mirror and he saw the accident between Chakonas' car and a semitruck. Solma turned around and saw the truck pushing Chakonas' car. Reid estimated that he traveled 300 to 500 yards before the accident occurred. Reid testified that about 10 seconds passed from when he was at the stop sign and he saw the accident in his rearview mirror.

¶ 23    Troy Layton testified that in July 2002 he was employed as a patrol officer with the LaPorte County police department. He was dispatched to the accident at Route 30 and Lincoln and arrived shortly after the accident occurred. On cross-examination, Layton stated that his police report did not indicate that Reeves was fatigued. Layton agreed that there were no signs of anyone being asleep or tired.

¶ 24    Dean Ayen testified that he was employed as a manager for Alder and Alco. He was Reeves' immediate supervisor and would set Reeves' schedule and routes. Ayen stated that the tractor involved in the accident was owned by Alder and the trailer was owned by Dean Foods. According to Ayen, Alder exclusively "pulls" Dean Foods products.

¶ 25    Ayen testified that Reeves would turn in his trip tickets on Saturday or Sunday, at the end of a week. The trip tickets would be used to calculate Reeves' pay. Ayen stated that the company has 30 other drivers who would use the tractor when it was in Chemung. On the day of the accident, Reeves volunteered to make the run between Chemung and Rochester,

- 6 -

Indiana, because Reeves had the hours available to drive. Ayen looked at the log to verify, but did not check anything else to see if Reeves still had hours he could drive.

¶ 26　Ayen testified that he was aware of the audit of Reeves' logbooks and the finding that the logs had been falsified and that Alder had been fined. Ayen explained that the audit was random and the majority of the fine was for local delivery drivers. The audit found four or five "over-the-road problems," including Reeves. Ayen stated that the problem was "the wrong miles on a log. It could have been an hourly add or subtraction was what they found on that."

¶ 27　Daniel White testified that he was the assistant safety manager for Alder. He performed the compliance reviews on the logs. White stated that he did not find any problems with Reeves' logbooks, but the audit did find that there were falsifications. This finding was prior to July 2002. White testified that a log of "anything past 575 to 600 miles in a 24-hour period" would have caught his attention.

¶ 28　Donald Hess testified as an expert witness for plaintiffs with his expertise based on his years working as a truck driver and teaching truck driving courses. His opinions were "based around the fact that Mr. Reeves and the employers violated a number of federal safety statutes that are related to truck driving," and he specifically referred to regulations relating to fatigue and speed. During Hess's testimony, Hess stated that "the company [was] dispatching the driver too many miles per day" and "the driver then [was] speeding, in order to get these runs accomplished." Defense counsel objected that Hess's opinion regarding speed was improper because his opinion on the subject had not been previously disclosed. Following a sidebar, the trial court overruled the objection.

¶ 29　Hess opined that these circumstances led to fatigue and referred to the federal regulation that a driver was limited to 70 hours of work time over an 8-day period. The hours-of-service requirements were in place to help drivers avoid being fatigued. Hess concluded that Reeves had been in excess of the service hour requirements "so he was fatigued." Hess admitted that he did not have any "specific information" that Reeves was fatigued at the time of the accident. Hess also testified that if Reeves had not been speeding, then he would not have reached the location when the car pulled out.

¶ 30　Hess testified about inconsistencies in Reeves' log compared to the truck's "Detroit Diesel Electronic Controls" (DDEC), considered to be the truck's "black box." He stated that the DDEC report was frequently at odds with Reeves' daily log for his hours. Specifically, Reeves' log from the week leading up to the crash indicated that the truck was not being driven, but the DDEC showed the truck in use for some of that time. Hess said in reviewing the DDEC report, he made the assumption that at any time the truck is idling, then Reeves was on duty, but not driving. Hess admitted that drivers might be off duty and sleeping with the air conditioning running, which would have the truck in idle mode on the DDEC. Hess also acknowledged that the DDEC does not indicate who is driving the truck and another driver could be operating the truck. Hess detailed the entire week prior to the accident and compared the DDEC report to Reeves' logs to determine his driving and duty hours. Hess relied exclusively on the DDEC report to form his opinion that Reeves had exceeded the 70-hour rule prior to July 6, 2002. In contrast, Reeves' logs for that week indicated that he had driven less than 70 hours.

¶ 31　Hess also testified that the data retrieved from the semitruck's engine control module (ECM) showed that on July 1, Reeves had reached a speed of 79.5 miles per hour and that

Reeves' average speed was 65.9 miles per hour. Hess concluded that in his opinion, the violations of the federal regulations were the cause of death of the plaintiffs' decedents.

¶ 32     Michael Rogers investigated the accident as an expert for plaintiffs. Rogers measured the distance between the point of impact and the point of rest as approximately 358 feet. The distance between the stop sign and the point of impact was approximately 58 feet. Rogers testified about the report from the sensing diagnostic module (SDM) from Chakonas' vehicle, which is the car's "black box" that "monitors the acceleration or movement of the vehicle and also gathers information from other vehicle components." It can sense when a collision is occurring to determine "whether this collision is going to be sufficient in magnitude to warrant a deployment of the air bag." The SDM stores this information, including vehicle speed, for up to five seconds before the air bag is deployed. Rogers stated that five seconds before the accident, the car was traveling four miles per hour and the brake was on. At the time of the accident, he testified that Chakonas' vehicle was traveling 12 miles per hour.

¶ 33     Based on his analysis of the scene and the vehicle reports, Rogers opined that the truck speed at the time of impact was 49.5 miles per hour. Rogers stated that a hard brake event would be recorded by the ECM if the truck speed slows more than seven miles per hour in one second. Rogers testified that a minute before the hard brake event, the truck was on cruise control and set at 65 miles per hour. Rogers said that in the last five seconds, the truck's speed was "dropping off much quicker" than it had been before that time. In his opinion, the reason for that decrease was the impact. Rogers testified that the truck's brake was applied four seconds after the impact and "that's what resulted in an even greater rate of slowing that cause[d] the hard brake event to occur." Rogers opined that "this collision would not have occurred if the truck was going 40 by the time it got to the second 40 mile per hour sign." Rogers also stated that the car would have had sufficient time to clear the lane if the truck had been going 55 miles per hour instead of 65 miles per hour.

¶ 34     R. Matthew Brach also testified as an expert for plaintiffs about his investigation of the accident. Brach stated that the first sign reducing the speed limit to 40 miles per hour from 55 miles per hour is about three-tenths of a mile from the accident intersection. Based on his reconstruction and using the DDEC, Brach testified that the truck was going 49.5 miles per hour at the point of impact. He further stated that the brakes were applied when the truck was going 37 miles per hour, which was three seconds after the impact. Brach also opined that if the truck had been going 40 miles per hour, then it would have been 130 feet west of the point of impact. Brach testified that Chakonas' vehicle would have moved past the point of impact.

¶ 35     Steven Rickard testified as an expert for defendants. In his opinion, Rickard concluded that Reeves was traveling 37 miles per hour when the collision occurred. He stated that according to the hard brake report, the cruise control was turned off 20 seconds before the hard brake. The foot was off the accelerator and the speed showed "a normal gradual continuation of slowing, and then, something happens." Rickard opined that just before the hard brake, Reeves moved his foot to the brake pedal. Rickard also noted that the engine load increased 16% at the hard brake, which was not present a second earlier. Rickard testified that the increase in engine load was caused by the car being pushed.

¶ 36     Rickard also reviewed the reports from Chakonas' vehicle's SDM. Based on that data, Rickard stated that vehicle did not brake within five seconds of the airbag deployment. Rickard testified that in his opinion, it was not safe for Chakonas' vehicle to pull in front of the truck.

Rickard admitted on cross-examination that he never visited the scene of the accident in reviewing the case. The parties rested after Rickard's testimony.

¶ 37    During closing arguments, counsel for Kakidas and McDonald argued that Reeves should be found 65% to 75% responsible for the accident and Chakonas "should be in the area of 35 percent to 25%." Similarly, Chakonas' attorney argued that defendants were 75% at fault for the accident. He conceded Chakonas "made a mistake" that was a proximate cause of the accident and she was 25% at fault. The jury found in favor of plaintiffs, but determined that Chakonas was 40% contributorily negligent in causing the accident.

¶ 38    We first address Dean Foods' argument that the Powell/Kakidas claims against it are barred by the statute of limitations. Dean Foods argues that filing of the Powell/Kakidas amended complaint which omitted Dean Foods as a defendant constituted a voluntary dismissal of Dean Foods and that the Powell/Kakidas second amended complaint was time barred because it was not filed within one year of the filing of the Powell/Kakidas amended complaint. On appeal, Dean Foods asserts that the Powell/Kakidas second amended complaint did not relate back to the Powell/Kakidas original complaint.

¶ 39    As noted, on October 12, 2007, Powell and Kakidas sought leave to file their second amended complaint *instanter*, seeking to add "Dean Foods Company" as a defendant. The trial court granted Powell and Kakidas leave to file their second amended complaint *instanter* and also granted Dean Foods leave to answer or otherwise plead to the Powell/Kakidas second amended complaint. On October 18, 2007, Dean Foods filed a motion to dismiss the Powell/Kakidas complaint because it was not named as a defendant in the Powell/Kakidas amended complaint and that the inclusion of "Dean Foods Company" in the October 12, 2007, Powell/Kakidas second amended complaint, over objection, was barred by the statute of limitations. Dean Foods argued that the filing of the Powell/Kakidas amended complaint constituted a voluntary dismissal of Dean Foods that was time barred if not refiled within one year and that the Powell/Kakidas second amended complaint pled new theories that did not relate back to the Powell/Kakidas original complaint. Powell and Kakidas filed a response to Dean Foods' motion to dismiss, arguing:

> "Dean Foods [Company] was never voluntarily dismissed by [Powell and Kakidas]. It was inadvertently left off the amended complaint when [defense counsel] advised [Powell and Kakidas' counsel] that Dean Illinois Dairies, LLC, was the owner of the trailer, not Dean Foods [Company].
>
> * * *
>
> The evidence adduced in discovery, and at trial, indicates that Dean Foods Company is a proper defendant. Furthermore, Dean Foods [Company] will suffer no prejudice by being included in [the Powell/Kakidas second amended complaint], because it has always been a defendant in the consolidated case of Chakonas v. Dean Foods Company, No. 03 L 15077. Finally, [the Powell/Kakidas second amended complaint] relates back to their timely filed [original complaint and amended complaint]."

Powell and Kakidas further asserted that their second amended complaint corrected the "clerical omission of Dean Foods [Company] from the amended complaint."

¶ 40    On October 29, 2007, the trial court denied Dean Foods' motion to dismiss the Powell/Kakidas second amended complaint.

¶ 41    Section 2-616(b) of the Code of Civil Procedure governs the relation-back doctrine and provides as follows:

"The cause of action, cross claim or defense set up in any amended pleading shall not be barred by lapse of time under any statute or contract prescribing or limiting the time within which an action may be brought or right asserted, if the time prescribed or limited had not expired when the original pleading was filed, and if it shall appear from the original and amended pleadings that the cause of action asserted, or the defense or cross claim interposed in the amended pleading grew out of the same transaction or occurrence set up in the original pleading, even though the original pleading was defective in that it failed to allege the performance of some act or the existence of some fact or some other matter which is a necessary condition precedent to the right of recovery or defense asserted, if the condition precedent has in fact been performed, and for the purpose of preserving the cause of action, cross claim or defense set up in the amended pleading, and for that purpose only, an amendment to any pleading shall be held to relate back to the date of the original pleading so amended." 735 ILCS 5/2-616(b) (West 2006).

¶ 42    The purpose of the relation-back doctrine is to preserve meritorious causes of action against a dismissal by reasons of a technical default. *Porter v. Decatur Memorial Hospital*, 227 Ill. 2d 343, 355 (2008); *Stevanovic v. City of Chicago*, 385 Ill. App. 3d 630, 633 (2008). Trial courts are to liberally construe the requirements of section 2-616(b) (735 ILCS 5/2-616(b) (West 2006)) to allow resolution of litigation on the merits and to avoid elevating questions of form over substance. *Porter*, 227 Ill. 2d at 355 (citing *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 106 (1996), and *Boatmen's National Bank of Belleville v. Direct Lines, Inc.*, 167 Ill. 2d 88, 102 (1995)). Both the statute of limitations and section 2-616(b) are designed to afford a defendant a fair opportunity to investigate the circumstances upon which liability is based while the facts are accessible. *Porter*, 227 Ill. 2d at 355 (citing *Boatmen's National Bank*, 167 Ill. 2d at 102). The rationale behind the "same transaction or occurrence" rule is that a defendant is not prejudiced if " 'his attention was directed, within the time prescribed or limited, to the facts that form the basis of the claim asserted against him.' " *Boatmen's National Bank*, 167 Ill. 2d at 102 (quoting *Simmons v. Hendricks*, 32 Ill. 2d 489, 495 (1965)). "A court should consider the entire record, including depositions and exhibits, to determine whether the defendant had such notice." *Porter*, 227 Ill. 2d at 355 (citing *Wolf v. Meister-Neiberg, Inc.*, 143 Ill. 2d 44, 46 (1991)).

¶ 43    In this case, the suit was commenced within the limitations period, Dean Foods received notice of the proceedings, actually participated in them, and cannot claim prejudice as the causes of action alleged in the Powell/Kakidas second amended complaint grew out of the same transactions or occurrence set up in the Powell/Kakidas original complaint. Therefore, we find that the allegations of the second amended complaint are not barred by the statute of limitations as a result of the doctrine of relation back.

¶ 44    We next address defendants' claims that the trial court should have granted their motions for judgment notwithstanding the verdicts. Defendants contend that the evidence presented at trial failed as a matter of law to establish that Reeves was the legal cause of the accident

because Reeves was the driver on the preferential highway and it was not reasonably foreseeable that Chakonas' vehicle, with a stop sign and a duty to yield the right of way, would proceed into the intersection in front of Reeves' semitruck. Plaintiffs respond that the evidence proved that Reeves was negligent because, if Reeves had not been speeding, as their experts testified, then Chakonas would have been able to cross the lanes of traffic safely. Plaintiffs maintain that the evidence of Reeves' excessive speed and his violation of federal regulations, by driving over 70 hours in an 8-day period, established that Reeves was the legal cause of the collision.

¶ 45   A motion for judgment notwithstanding the verdict should be granted only when all the evidence, viewed in the light most favorable to the nonmovant, so overwhelmingly favors the moving party that no other verdict based on the evidence could stand. *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 177 (2008) (citing *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). " 'This is clearly a very difficult standard to meet, limiting the power of the [trial] court to reverse a jury verdict to extreme situations only.' " *Velarde v. Illinois Central R.R. Co.*, 354 Ill. App. 3d 523, 537 (2004) (quoting *People ex rel. Department of Transportation v. Smith*, 258 Ill. App. 3d 710, 714 (1994)). " '[I]t is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony.' " *Velarde*, 354 Ill. App. 3d at 537 (quoting *Maple v. Gustafson*, 151 Ill. 2d 445, 452 (1992)). " 'A trial court cannot reweigh the evidence and set aside a verdict merely because the jury could have drawn different inferences or conclusions, or because the court feels that other results are more reasonable.' " *Velarde*, 354 Ill. App. 3d at 537 (quoting *Maple*, 151 Ill. 2d at 452). " 'The [trial] court has no right to enter a [judgment notwithstanding the verdict] if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome.' " *Velarde*, 354 Ill. App. 3d at 537 (quoting *Maple*, 151 Ill. 2d at 454). This court reviews a trial court's decision to grant or deny a motion for judgment notwithstanding the verdict *de novo*; however, like the trial court, we must be careful not to usurp the function of the jury and substitute our own assessment. *Velarde*, 354 Ill. App. 3d at 537 (citing *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1125 (2000)).

¶ 46   The term "proximate cause" involves two components: cause in fact and legal cause. *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257-58 (1999) (citing *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992)); see also *Abrams v. City of Chicago*, 211 Ill. 2d 251, 258 (2004). Cause in fact exists where there is a reasonable certainty that a defendant's acts caused the injury or damage, but a defendant's conduct is a cause in fact of the plaintiff's injury only if that conduct is a material element and a substantial factor in bringing about the injury. *Galman*, 188 Ill. 2d at 258. "A defendant's conduct is a material element and a substantial factor in bringing about an injury if, absent that conduct, the injury would not have occurred." *Galman*, 188 Ill. 2d at 258. Whereas, "legal cause" is a question of foreseeability and "[t]he relevant inquiry here is whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Galman*, 188 Ill. 2d at 258.

¶ 47   Defendants cite to a series of cases recognizing the "unavoidable collision" principle, as it has been termed, in arguing that Reeves' excessive speed was not the legal cause of the collision. See *Hale v. Cravens*, 129 Ill. App. 2d 466, 472 (1970); *Salo v. Singhurse*, 181 Ill.

App. 3d 641, 643 (1989); *Johnson v. May*, 223 Ill. App. 3d 477 (1992); *Coole v. Central Area Recycling*, 384 Ill. App. 3d 390, 400 (2008). Plaintiffs assert that this line of cases is distinguishable from the present case because this case included the testimony of multiple expert witnesses to explain the circumstances of the collision and those cases lacked expert testimony.

> "In cases where the reviewing court has concluded an accident was unavoidable, the courts have found the following:
>
>> '[T]he motorist on the preferential road had the right to expect that the vehicle approaching on the secondary road controlled by a stop sign would obey the stop sign and yield the right-of-way. When the motorist drove into the path of the preferential driver, the circumstances afforded no opportunity to avoid the collision.' " *Coole*, 384 Ill. App. 3d at 398 (quoting *Guy v. Steurer*, 239 Ill. App. 3d 304, 309 (1992)).

¶ 48       In *Hale*, the plaintiffs were driving on US Route 54 in Illinois. Route 54 is a two-lane highway, with a speed limit of 65 miles per hour. It was the preferential highway with no stop signs. The defendant was traveling on Buffalo Hart Road, which had a stop sign at the intersection with Route 54. A jury verdict was returned in favor of defendant and plaintiffs appealed.

¶ 49       The *Hale* court noted that the defendant had a statutory duty to stop and yield the right-of-way to the plaintiffs and the only bar to the plaintiffs' recovery was their contributory negligence, which in this case could have been the plaintiffs' speed and failure to keep a proper lookout. *Hale*, 129 Ill. App. 2d at 471-72. The *Hale* court reasoned that "[a] traveler on a preferential highway has a right to expect a car approaching along a secondary road controlled by a stop sign to obey the stop sign and yield the right-of-way as required by law." *Hale*, 129 Ill. App. 2d at 472.

> " 'Stop signs are erected for the obvious purpose of requiring motorists to yield to vehicles on through highways. If the motorist on the through highway had to travel at such a speed that he could stop his car in time to avoid collisions with vehicles which ignore stop signs on intersecting roads, the purpose of having a through highway in the first place would be entirely thwarted. The driver who has the stop sign cannot assume the car on the through highway will stop. It is the other way around.' " *Hale*, 129 Ill. App. 2d at 472-73 (quoting *Hession v. Liberty Asphalt Products, Inc.*, 93 Ill. App. 2d 65, 74 (1968)).

¶ 50       Further, the *Hale* court concluded that even in the light most favorable to defendant, the plaintiffs' speed was not the proximate cause of the accident. "Whether the speed of plaintiffs' automobile was 60 miles per hour or 70 miles per hour, the sole cause of the collision was the fact that defendant drove her automobile directly into the path of plaintiffs' vehicle under circumstances that afforded plaintiffs no opportunity to avoid the collision." *Hale*, 129 Ill. App. 2d at 473.

> " 'Violation of a law at the time of an accident by one connected with it is usually evidence of negligence, but there remains a question of fact whether the illegal act is the proximate cause of the injury. The mere fact, if it be a fact, that defendant in error was violating the law at the time he was injured will not bar his right to recover unless the unlawful act in some way proximately contributed to the accident in which he was

- 12 -

injured. If the illegal act is a mere condition which made it possible for the accident to occur but is not itself a part of the accident it will not bar recovery.' " *Hale*, 129 Ill. App. 2d at 474 (quoting *Jeneary v. Chicago & Interurban Traction Co.*, 306 Ill. 392, 395 (1923)).

¶ 51    The *Hale* court noted that it was "mindful" of the weight given to jury verdicts, but found that the evidence did not support the verdicts.

> "Whether they were swayed by sympathy for defendant because her minor son was killed in the collision, which plaintiffs claim resulted from the defendant's improper emphasis at the trial, or by other factors, is immaterial. We think that the evidence in this case, when viewed in its aspects most favorable to the defendant, so overwhelmingly favor the plaintiffs that no verdict against the plaintiffs based on that evidence could ever stand, and the court should have granted plaintiffs' motions for judgment notwithstanding the verdict." *Hale*, 129 Ill. App. 2d at 475.

¶ 52    The court then reversed the jury's verdict in favor of the defendant and remanded for a new trial on damages only. *Hale*, 129 Ill. App. 2d at 476.

¶ 53    In *Salo*, the plaintiff argued that he, as the driver on the preferential highway, had a right to expect the driver on the secondary road to yield the right of way to him and that he did not proximately cause the accident. *Salo*, 181 Ill. App. 3d at 642-43. The reviewing court agreed with the plaintiff and reversed the judgment apportioning 60% of the fault to the plaintiff because "[f]or the jury to attribute 60% of the fault to Salo under such circumstances [was] not only contrary to the manifest weight of the evidence, but also beyond comprehension and reason." *Salo*, 181 Ill. App. 3d at 644.

> "Whether or not the jury believed Salo should have exercised more caution under the circumstances of a flashing yellow light by possibly slowing down more or watching Singhurse's car longer in order to sound his horn or swerve, any negligence on his part was not the proximate cause of the collision. Singhurse had a duty to stop and yield the right-of-way to approaching cars. Instead, she rolled into the intersection and hit Salo's car after he was already in the intersection at a time when there was nothing he could do to avoid the collision. Salo could not reasonably be expected to anticipate Singhurse entering the intersection in disregard of her duty to yield. But for Singhurse running the stop sign or not looking, the collision would not have occurred. *** If we were to follow the jury's apportionment in this case, every time a driver on a preferential highway saw an approaching car on an intersecting road or drive, he essentially would be required to stop to make sure the other car obeyed the stop sign and stayed there or else be found negligent." *Salo*, 181 Ill. App. 3d at 643-44.

¶ 54    In *Johnson*, the reviewing court reversed a jury's verdict that the plaintiff was 50% contributorily negligent and found the defendant to be 100% negligent. There, the plaintiff was driving a tractor-trailer on the preferential highway when he was struck by the defendant's truck crossing the intersection from a street with a stop sign. The court reasoned that under the defendant's version of the facts, he stopped at the stop sign and then the plaintiff would have no reason to believe that the defendant would proceed into the intersection and not yield the right-of-way. There was nothing the plaintiff could reasonably have done to avoid the collision. *Johnson*, 223 Ill. App. 3d at 484.

¶ 55    Similarly, in *Coole*, the court affirmed the trial court's grant of summary judgment in favor of the defendants because the plaintiff's decedent failed to yield the right-of-way to a garbage truck owned by the defendants. The court concluded that the plaintiff failed to provide any evidence "supporting an inference [the garbage truck driver] could have avoided the accident if he would have been driving slower, had been keeping a better lookout, or had applied the brakes." *Coole*, 384 Ill. App. 3d at 400. The court found that a reasonable jury could not find that the garbage truck driver's breach of duty was a substantial cause of the accident and summary judgment was proper. *Coole*, 384 Ill. App. 3d at 400-01.

¶ 56    The circumstances of the instant case are similar to those presented in *Hale*, *Salo*, *Johnson*, and *Coole* since they all involve collisions and the first three decisions involve accidents between a driver on a preferential highway and another driver on a nonpreferential road. They do in some measure support defendants' argument on the issue of legal cause.

¶ 57    Plaintiffs cite the decision in *Guy v. Steurer*, 239 Ill. App. 3d 304 (1992), as support for their position that the duty of the intersecting driver to yield only arises when the oncoming driver constitutes an immediate hazard. There, the jury returned a verdict in favor of the defendant. *Guy*, 239 Ill. App. 3d at 306-07. On appeal, the plaintiff argued that his motion for judgment notwithstanding the verdict or motion for a new trial should have been granted by the trial court. The *Guy* court cited the Illinois Vehicle Code provision that requires: "a driver at a stop sign on a road intersecting with a preferential highway must yield the right-of-way to any vehicle approaching so closely on the highway that it constitutes an immediate hazard to his vehicle's travel across the intersection." *Id.* at 307 (citing Ill. Rev. Stat. 1989, ch. 95½, ¶ 11-904(b)). It then pointed out that "[t]his provision has not been construed to impose absolute liability upon a party approaching a stop sign on a nonpreferential road such that he must stop long enough to permit *any* car he observes on the highway to pass, regardless of its distance from the intersection." (Emphasis added.) *Guy*, 239 Ill. App. 3d at 307-08 (citing Ill. Rev. Stat. 1989, ch. 95½, ¶ 11-904(b)). "Rather, the statute requires the motorist confronted by the stop sign to exercise reasonable care and proceed across the intersection after he has stopped and yielded the right-of-way to vehicles on the highway that constitute an 'immediate hazard.' " *Guy*, 239 Ill. App. 3d at 308 (quoting *Pennington v. McLean*, 16 Ill. 2d 577, 583 (1959)). Similarly, the driver on the preferential roadway does not have an absolute right to proceed through the intersection, but has a duty to exercise due care, keep a proper lookout, and drive as a prudent person would to avoid a collision. *Guy*, 239 Ill. App. 3d at 308.

¶ 58    The *Guy* court observed that there was "no precise formula" for determining whether a particular vehicle followed the duty imposed on it. *Guy*, 239 Ill. App. 3d at 308. "The issue involves considerations as to the relative speeds and distances of the vehicles from the intersection and must be determined by the trier of fact." *Guy*, 239 Ill. App. 3d at 308. The *Guy* court reasoned that the case did not involve an unavoidable collision because the plaintiff admitted that he observed the defendant cross four lanes of traffic, but failed to slow down or otherwise try to avoid the accident because he thought the defendant would stop. "[P]laintiff had an opportunity to avoid the collision by decreasing his speed, sounding his horn, or changing lanes. This is significant in that it bears on whether plaintiff observed his own duty to exercise due care in approaching and crossing the intersection and to drive as a prudent person would to avoid a collision when danger is discovered, or should have been discovered by the exercise of reasonable care." *Guy*, 239 Ill. App. 3d at 310. The *Guy* court concluded that the

- 14 -

evidence was sufficient for the jury to have found the plaintiff more than 50% negligent and bar any recovery. *Guy*, 239 Ill. App. 3d at 310.

¶ 59    Under all of the authority outlined above, Reeves and Chakonas each had duties to follow while approaching the intersection. A driver of a vehicle approaching an intersection with a stop sign has a duty to stop and after having stopped, to yield the right-of-way to any vehicle which has entered the intersection or is approaching so closely as to constitute an immediate hazard during the time the driver was in the intersection. *Johnson*, 223 Ill. App. 3d at 483 (citing Ill. Rev. Stat. 1987, ch. 95½, ¶ 11-904(b)).[3] Although the driver on a preferential highway has the right to expect that the vehicle approaching on the secondary roadway controlled by a stop sign will obey the stop sign and yield the right-of-way, the driver does not have an absolute right to proceed into the intersection. Rather, the preferential driver "has a duty to keep a proper lookout, observe due care in approaching and crossing intersections, and drive as a prudent person would to avoid a collision when danger is discovered or, by the exercise of reasonable care, should have been discovered." *Johnson*, 223 Ill. App. 3d at 484 (citing *Salo*, 181 Ill. App. 3d at 643).

¶ 60    Differing testimony was presented regarding Reeves' speed at the time of the accident. Plaintiffs' experts opined that Reeves was traveling 49.5 miles per hour at the time of the collision while the defense expert concluded that Reeves was traveling 37 miles per hour. Reeves testified that he thought he was going between 40 to 45 miles per hour. The evidence regarding whether Reeves was fatigued and in violation of the 70-hour rule was also contested. Hess opined that Reeves had exceeded his 70 hours at the time of the accident according to the DDEC information and based on Hess's own experience, Reeves would have been fatigued. Reeves testified that he was not over his hours and was not fatigued. Ayen, Reeves' supervisor, also stated that he checked Reeves' log prior to Reeves leaving on this delivery and he was not over 70 hours. Finally, plaintiffs asserted that Reeves could have taken evasive action to avoid the collision and that Reeves should have noticed Chakonas' vehicle prior to impact. Reeves testified that he observed the Reid vehicle, but he did not see Chakonas' vehicle until the impact.

¶ 61    Based on the evidence presented at trial, the jury could have concluded that Reeves' speeding was a legal cause of the collision because it was reasonably foreseeable that a driver seeking to merge onto Route 30 from Lincoln Street might misjudge how long it would take the semitruck to reach the intersection. Further, the jury could have determined that, based upon the evidence, Reeves could have avoided the collision with the Chakonas vehicle. As noted, Reeves testified that he applied his brakes when he observed the Reid vehicle crossing the intersection; however, Rogers opined that Reeves only applied the semitruck's brakes four seconds after impact with the Chakonas vehicle, and Brach testified that Reeves only applied the semitruck's brakes three seconds after impact.

¶ 62    Additionally, the jury could have found that Reeves' violation of the 70-hour rule at the time of the collision was also part of a legal cause of the accident. While we find the evidence to be extremely close on this issue and could have resulted in a verdict either for or against plaintiffs, it is not our function to reweigh the evidence. " '[I]t is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide

_____

[3]We acknowledge that the jury was instructed of a driver's duties under Indiana law.

- 15 -

what weight should be given to the witnesses' testimony.' " *Velarde*, 354 Ill. App. 3d at 537 (quoting *Maple v. Gustafson*, 151 Ill. 2d 445, 452 (1992)).

¶ 63 Given the contested evidence of speeding and fatigue, the jury could have concluded that the evidence supported a finding that Reeves was the legal cause of the collision.

¶ 64 Dean Foods additionally argues that it is entitled to a judgment notwithstanding the verdict because plaintiffs failed to prove that it was vicariously liable for the actions of Reeves. Specifically, Dean Foods claims that plaintiff failed to introduce evidence of any words or conduct by Dean Foods necessary to establish their actual agency/joint venture claims. Dean Foods contends plaintiffs failed to call any Dean Foods representative as a witness, but simply relied on the testimony of Reeves and other Alco and Alder employees, statements in the Alder driver's manual, and evidence that the Dean Foods logo appeared on the truck tractor and trailer, on the uniforms of Alder and Alco employees, etc., to establish an agency relationship. We disagree.

¶ 65 An agency is a fiduciary relationship in which the principal has the right to control the agent's conduct and the agent has the power to act on the principal's behalf. *Letsos v. Century 21-New West Realty*, 285 Ill. App. 3d 1056, 1064 (1996). An agent's authority may be either actual or apparent, and actual authority may be either express or implied. *C.A.M. Affiliates, Inc. v. First American Title Insurance Co.*, 306 Ill. App. 3d 1015, 1021 (1999). "Only the alleged principal's words and conduct, not those of the alleged agent, establish the agent's authority." *Kaporovskiy v. Grecian Delight Foods, Inc.*, 338 Ill. App. 3d 206, 210 (2003).

¶ 66 Generally, the question of whether an agency relationship exists and the scope of the purported agent's authority are questions of fact. *Progress Printing Corp. v. Jane Byrne Political Committee*, 235 Ill. App. 3d 292, 306 (1992). A principal-agent relationship exists when the principal has the right to control the manner in which the agent performs his work and the agent has the ability to subject the principal to liability. *Lang v. Silva*, 306 Ill. App. 3d 960, 972 (1999).

¶ 67 Dean Foods correctly points out that "to establish the actual authority of an agent, the authority must be founded upon some word or act of the principal, not on the acts or words of the agent." *Wadden v. Village of Woodridge*, 193 Ill. App. 3d 231, 239 (1990). However, our Illinois Supreme Court has cautioned that this principle "is not to be confused with the rule which permits an alleged agent to be called as a witness for the purpose of establishing the existence of an agency." *City of Evanston v. Piotrowicz*, 20 Ill. 2d 512, 519 (1960). As the supreme court explained in *Piotrowicz*:

"Agency may be established and its nature and extent shown by parol evidence, whether direct or circumstantial, and reference may be had to the situations of parties and property, acts of the parties, and other circumstances germane to the question, and if the evidence shows one acting for another under circumstances implying knowledge on the part of the supposed principal of such acts, a *prima facie* case of agency is established." *Piotrowicz*, 20 Ill. 2d at 518.

¶ 68 "The existence of an agency relationship may be established by circumstantial evidence, including the situation of the parties, their acts and other relevant circumstances." *Prodromos v. Everen Securities, Inc.*, 341 Ill. App. 3d 718, 724-25 (2003).

¶ 69    Here, the evidence was sufficient to establish that Dean Foods had the right to control the actions of Alder/Alco's drivers. At the time of the collision, the relationship between Dean Foods and Alder/Alco had been in place for 60 years, and Alder/Alco "pulled" exclusively for Dean Foods. In 2000, Alder received the "Partners in Distribution Award" from Dean Foods. White, "Alder and Alco's" assistant safety director and driver trainer at the time of the collision, testified that he used letterhead that bore Dean Foods insignia with the notation "distributor of Dean Foods" in the performance of his job, including the reprimand of drivers. The "Alder Companies Driving Manual," which was admitted into evidence without objection, states that Alder/Alco drivers were part of Dean Foods' fleet and instructs the drivers to wear Dean Foods clothing and act in a manner that will encourage positive opinions about Dean Foods. In particular, the manual states "When you step out of your truck, you are immediately recognized as DEAN FOODS." Perhaps most importantly, Dean Foods owned the loaded trailer which Reeves was "pulling" at the time of the collision.

¶ 70    Despite the foregoing, Dean Foods argues that the evidence established, as a matter of law, that Alder/Alco had sole control over Reeves' driving and that Dean Foods exercised no such control. Dean Foods mistakenly relies on the fact that it chose not to exercise its right to control the Alder/Alco drivers. However, it is the right or duty to supervise and control, not the exercise of the right, that determines whether an agency exists. *Lang*, 306 Ill. App. 3d at 972.

¶ 71    The cases cited by Dean Foods in support of its argument are distinguishable. In *Daniels v. Corrigan*, 382 Ill. App. 3d 66 (2008), this court considered whether a principal-agency relationship existed between the owner of a taxicab and Yellow Cab Affiliation Company. A City of Chicago ordinance required all taxicab medallion owners to be affiliated with a taxicab affiliation licensed by the city, but the affiliation agreement signed by the taxicab owner expressly provided that the owner was an independent contractor and that the affiliation agreement did not create an agency or joint venture. *Daniels*, 382 Ill. App. 3d at 77-78. This court found that there was no conduct which, irrespective of the express agreement, would give rise to an agency-principal relationship. The taxicab owner set the hours of operation and paid all the expenses for the taxicab, was free to decide which fares to pick and was under no obligation to report any fares to the affiliation. The presence of an express agreement disclaiming an agency or joint venture is not present in the case at bar.

¶ 72    The circumstances involved in *Trzaska v. Bigane*, 325 Ill. App. 528 (1945), and *Shoemaker v. Elmhurst-Chicago Stone Co.*, 273 Ill. App. 3d 916 (1994), also cited by Dean Foods are likewise factually distinguishable. *Trzaska* involved a truck owner/driver who occasionally delivered coal for a coal company. The coal company hired the driver on an as-needed basis and he was free to refuse to haul any load. He delivered the coal where he was instructed to deliver it and collected money for the load when he was requested to do so. The court found that the evidence showed that the coal company had no control over the driver. *Trzaska*, 325 Ill. App. at 534.

¶ 73    In *Shoemaker*, relying in part on *Trzaska*, the court found that a driver was not the agent of the stone company whose products he hauled on behalf of the trucking company that leased the truck he operated. The court rejected the argument that instructing the driver where to take the load constituted control of the driver, and concluded that the driver was an independent contractor in the absence of any other evidence of control. *Shoemaker*, 273 Ill. App. 3d at 922.

¶ 74    The cases cited by Dean Foods do not support the contention that under the facts presented here there was no agency relationship between Dean Foods and Reeves. The evidence showed that Dean Foods had the right to control the actions of Alco's drivers. At the time of the collision, the relationship between Dean Foods and Alder/Alco had been in place for 60 years, and Alder/Alco "pulled" exclusively for Dean Foods. In 2000, Alder received the "Partners in Distribution Award" from Dean Foods. White, "Alder and Alco's" assistant safety director and driver trainer at the time of the collision, testified that he used letterhead that bore Dean Foods insignia with the notation "distributor of Dean Foods" in the performance of his job, including the reprimand of drivers. The "Alder Companies Driving Manual," which was admitted into evidence without objection, states that Alder/Alco drivers were part of Dean Foods' fleet and instructs the drivers to wear Dean Foods clothing and act in a manner that will encourage positive opinions about Dean Foods. In particular, the manual states "When you step out of your truck, you are immediately recognized as DEAN FOODS." Again, and perhaps most importantly, Dean Foods owned the loaded trailer which Reeves was "pulling" at the time of the collision.

¶ 75    Accordingly, the trial court did not err in denying defendants' motions for judgment notwithstanding the verdicts on the issue of legal cause and the issue of Dean Foods' agency.

¶ 76    However, we conclude the evidence at trial failed to establish the existence of a joint venture between Dean Foods and Alder, Alco, and Reeves. "A joint venture is defined as 'an association of two or more persons to carry out a single enterprise for profit.' " *Thompson v. Hiter*, 356 Ill. App. 3d 574, 582 (2005). Like the existence of an agency relationship, the existence of a joint venture may be inferred from the circumstances and does not require a formal agreement. *Thompson*, 356 Ill. App. 3d at 582. The factors to be considered in determining whether a joint venture exists include: (1) a community of interest in the purpose of the joint association; (2) a right of each member to direct and govern the policy or conduct of the other members; (3) a right to joint control and management of the property used in the enterprise; and (4) a sharing in both profits and losses. *Thompson*, 356 Ill. App. 3d at 582. "In the absence of any one of the elements, a joint venture does not exist." *Daniels*, 382 Ill. App. 3d at 80.

¶ 77    Although the evidence showed that Alco/Alder was a distributor of Dean Foods, the evidence did not show that Dean Foods shared its profits and losses with Alco/Alder. As previously discussed, none of the trial witnesses were representatives of Dean Foods. Therefore, the only evidence relating to the existence of a joint venture was testimony from Alco/Alder employees. However, none of the witnesses at trial gave any testimony indicating that profits and losses were shared among the companies. No other circumstantial evidence was admitted to prove this element. Without evidence that Dean Foods and Alco/Alder shared profits and losses, then as a matter of law, a joint venture could not be found. We also question whether the evidence at trial was sufficient to establish that Alco/Alder had the right to direct and govern Dean Foods' policy or conduct. Since the absence of one element negates the existence of joint venture, Dean Foods was entitled to a judgment notwithstanding the verdict as to the finding of a joint venture.[4]

_____

[4]Although Dean Foods has not raised the issue of the jury instructions on joint venture, we point out that the trial court erroneously instructed the jury about the elements of a "joint enterprise" as defined in

- 18 -

¶ 78    Defendants also claim that the jury's verdicts were contrary to the manifest weight of the evidence due to the lack of evidence of proximate cause, and thus they are entitled to a new trial. Dean Foods also contends it is entitled to a new trial on the issue of agency. "On a motion for a new trial, the court, after weighing the evidence, will set aside the verdict and order a new trial ' "if the verdict is contrary to the manifest weight of the evidence." ' " *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 100-01 (2010) (quoting *Maple*, 151 Ill. 2d at 454, quoting *Mizowek v. De Franco*, 64 Ill. 2d 303, 310 (1976)). "A verdict is against the manifest weight of the evidence ' "where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence." [Citations.]' " *Lazenby*, 236 Ill. 2d at 101 (quoting *Maple*, 151 Ill. 2d at 454).

¶ 79    Based upon our review of the evidence already outlined above, we cannot say the verdicts are against the manifest weight on the questions of proximate cause and Dean Foods' agency. Accordingly, the trial court did not err in denying defendants' motions for a new trial on these issues.

¶ 80    We next consider whether the remaining defendants were denied a fair trial when the trial court admitted evidence of the prior bad acts of Reeves, Alco and Alder. Specifically, defendants argue that there was no proper purpose for informing the jury that (1) Reeves was speeding on days prior to the accident; (2) Reeves and Alder violated federal trucking regulations several weeks and months prior to the accident; (3) Reeves had been found guilty of falsifying driving logs prior to the accident; and (4) Reeves and Alder had been fined by the federal government after an audit for misconduct that occurred prior to the accident. Defendants assert that the admission of this evidence was erroneous, highly prejudicial, and warrants the granting of a new trial.

¶ 81    Plaintiffs maintain that the evidence of prior bad acts was properly admitted because the evidence of earlier log violations demonstrated Alco's knowledge in scheduling Reeves for long runs. According to plaintiffs, Alco "implicitly" approved of Reeves' driving time violations. Plaintiffs assert that the evidence was properly admitted to show absence of mistake that the violation was not accidental. Plaintiffs also argue that defense counsel opened the door to the admission of this evidence by stating in opening statements that the evidence would show that "he wasn't falsifying his logs."

¶ 82    Defendants filed two motions *in limine* to exclude evidence of prior bad acts. Prior to trial, the trial court granted defendants' motion *in limine* to exclude evidence of Reeves' prior traffic tickets for speeding. Later, prior to the introduction of evidence at trial, defendants filed a motion *in limine* to "exclude evidence of prior log violations." Defendants stated that Reeves was cited for a logbook violation prior to the accident, but they sought to exclude this evidence because the prior violation was irrelevant to the issues at trial and any probative value would

---

the IPI for "Automobile Guests–Joint Enterprise–Passengers." See IPI Civil (2006) No. 72.04. However, this instruction is generally used for an exception to the general rule that the negligence of a driver may not be imputed to his passenger. *Campanella v. Zajic*, 62 Ill. App. 3d 886, 887 (1978). Though similar, the elements for a joint enterprise are slightly different than the elements of a joint venture and this case did not involve whether Reeves and a passenger were engaged in a joint enterprise, but rather whether Dean Foods was part of a joint venture with Alder, Alco, and Reeves.

have been substantially outweighed by undue prejudice. The defendants also argued that the logbook violation could not be used for impeachment purposes.

¶ 83    In response, plaintiffs Powell and Kakidas asserted that Reeves was only cited for the logbook violation one month prior to the accident. They noted that he was specifically cited for "false reports of record of duty status" and his company was fined $10,000. Plaintiffs also argued that defense counsel opened the door for this evidence by stating in opening statements that Reeves "wasn't falsifying his logs." Plaintiffs claimed that the logbook violation was relevant to Reeves' credibility because it demonstrated his dishonesty and desire to conceal facts which ought to be reported. According to plaintiffs, this violation was a crime of dishonesty. Plaintiffs additionally claimed that the logbook violation gave his employer notice that Reeves was routinely driving over the speed limit and over his hours of service, such that it was incumbent on defendants not to schedule Reeves for runs near 500 miles.

¶ 84    Following argument, the trial court denied the defendants' motions *in limine* and allowed the admission of the prior logbook violation into evidence. The court found that "it is something a little bit more than a traffic citation. It is an affirmative act on the part of Mr. Reeves or was a part in the act Mr. Reeves and some *** action was taken in the form of a fine for a substantial amount and it did happen in close proximation to the accident." The court also noted that defense counsel "did make an affirmative statement during the course of [his] opening statement that requires them to bear a response." The court held that the evidence was relevant and probative. Defense counsel objected to the admission of the prior violation and stated that he would make a continuing objection at trial.

¶ 85    Additionally, prior to trial, defense counsel also moved to bar the testimony of Donald Hess, plaintiffs' expert. Hess was to testify as an expert on negligent hiring and supervision as well as to the logs and federal regulations kept for a trucking company. Defendants argued that Hess's testimony would have been duplicative because Alco admitted that Reeves was its employee. According to defendants, any negligence by Reeves would be imputed to his employer and reviewing federal logs was unnecessary. In response, plaintiffs contended that the federal violations were relevant because they had set forth allegations that Alco and Alder had violated federal safety regulations and those violations involved the employer's conduct and responsibility. According to plaintiffs, Hess had extensive experience with the federal regulations and he would "assist the jury in understanding how these regulations apply to real life and that the obligations of Alco and Alder are separate and distinct from the supervisory obligations over Mr. Reeves." The trial court denied the motion to bar Hess's testimony, but indicated that it would revisit the issue if the testimony became duplicative regarding negligent hiring.

¶ 86    Defendants then sought to exclude specific opinions of Hess, as set forth in his deposition. Defendants argued that there was no causal connection between any sort of logbook issue and why this accident happened. The court allowed, over defendants' objection, the admission of Hess's opinions that Alco and Alder encouraged Reeves to violate federal requirements and to drive in excess of the speed limit.

¶ 87    "Where it appears that an error did not affect the outcome below, or where the court can see from the entire record that no injury has been done, the judgment or decree will not be disturbed." *Both v. Nelson*, 31 Ill. 2d 511, 514 (1964); see also *Sbarboro v. Vollala*, 392 Ill. App. 3d 1040, 1057 (2009). "But where the case is a close one on the facts, and the jury might

- 20 -

have decided either way, any substantial error which might have tipped the scales in favor of the successful party calls for reversal." *Both*, 31 Ill. 2d at 514; *Sbarboro*, 392 Ill. App. 3d at 1057.

¶ 88 "It is axiomatic that '[e]vidence of specific prior bad acts unrelated to a material issue is prohibited.' " *Timothy Whelan Law Associates, Ltd. v. Kruppe*, 409 Ill. App. 3d 359, 369 (2011) (quoting *Sharma v. Zollar*, 265 Ill. App. 3d 1022, 1025 n.4 (1994)). "The law concerning the admissibility of a defendant's prior acts of misconduct in a criminal prosecution is fairly well established. Such evidence is inadmissible if introduced merely to establish the defendant's propensity to commit crime." *Thompson v. Petit*, 294 Ill. App. 3d 1029, 1034 (1998) (citing *People v. Thingvold*, 145 Ill. 2d 441, 452 (1991)). See also *Wernowsky v. Economy Fire & Casualty Co.*, 106 Ill. 2d 49, 53 (1985). "Propensity evidence is not rejected because it is irrelevant; 'on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudice one with a bad general record and deny him a fair opportunity to defend against a particular charge.' " *Thompson*, 294 Ill. App. 3d at 1034 (quoting *Michelson v. United States*, 335 U.S. 469, 475-76 (1948)). However, evidence of prior bad acts may be admitted if relevant to prove *modus operandi*, intent, identity, motive, absence of mistake, or any material question other than the propensity to commit crime. *Thompson*, 294 Ill. App. 3d at 1034-35.

¶ 89 "Although not expressed in exactly the same terms, Illinois has long subscribed to a similar rule in civil cases. The admission of evidence of prior similar tortious or wrongful conduct to establish purpose, intent, motive, knowledge or other mental state of a party to a civil action forms an exception to the general rule which prohibits proof of one wrongful act by evidence of the commission of another such act." *Thompson*, 294 Ill. App. 3d at 1035. " 'Evidence of misconduct other than that in issue is not properly admissible to establish a person's disposition to behave in a certain way.' " *Kruppe*, 409 Ill. App. 3d at 369 (quoting *Plooy v. Paryani*, 275 Ill. App. 3d 1074, 1089 (1995)).

¶ 90 Further, "the fact that evidence of prior acts of misconduct may be relevant to prove something other than propensity does not mean that such evidence should be admitted as a matter of course. Trial judges must still determine whether the danger of 'unfair prejudice' to the defendant 'substantially' outweighs the probative value of the prior-act evidence." *Thompson*, 294 Ill. App. 3d at 1036 (citing *People v. Illgen*, 145 Ill. 2d 353, 375-76 (1991)). "Such a determination is a matter committed to the sound discretion of the trial judge, and we will not reverse the court's resolution of the question absent a clear abuse of that discretion." *Thompson*, 294 Ill. App. 3d at 1036.

¶ 91 In *Kruppe*, the plaintiff filed a breach of contract action against the defendant in an attempt to collect fees owed for its representation of the defendant. The plaintiff had previously represented the defendant in shareholder litigation based on the defendant's involvement in two corporations. The defendant terminated the plaintiff's representation in favor of a new attorney and a dispute arose over payment of attorney fees. Following a jury trial, the jury awarded the plaintiff $30,330.14 and the trial court increased the award for a total of $50,000. *Kruppe*, 409 Ill. App. 3d at 361.

¶ 92 One of the issues raised on appeal was whether the trial court erred in allowing the plaintiff to present evidence of the defendant's alleged failure to pay other professionals for their services, specifically a fee petition filed by another law firm. The defendant objected to its

admission, but the trial court found the evidence relevant as to the defendant's credibility and his course of conduct. The court admitted the evidence. *Kruppe*, 409 Ill. App. 3d at 368-69.

¶ 93     The *Kruppe* court concluded that the trial court abused its discretion in admitting the evidence as a course of conduct. *Kruppe*, 409 Ill. App. 3d at 369. It held that "the only possible relevance we see for this evidence is to impugn defendant's character in an attempt to show that he acted in conformity therewith when he allegedly declined to pay plaintiff for its services. That, however, is not a permissible purpose for admitting such evidence." *Kruppe*, 409 Ill. App. 3d at 370.

> "In criminal cases, the danger that evidence of other bad acts is likely to overpersuade the fact finder and lead to a conviction by causing the fact finder to dislike the defendant is well recognized. *E.g.*, *People v. Manning*, 182 Ill. 2d 193, 213-14 (1998); *People v. Hensley*, 354 Ill. App. 3d 224, 232 (2004). The same danger is present here. Thus, the trial court abused its discretion in permitting the admission of this evidence." *Kruppe*, 409 Ill. App. 3d at 370.

¶ 94     Plaintiffs rely on a federal district court decision, *Trotter v. B&W Cartage Co.*, No. 05-cv-0205-MJR, 2006 WL 1004882 (S.D. Ill. Apr. 13, 2006), to support their position that the evidence of prior log violations was properly admitted. Plaintiffs assert that the district court in *Trotter* admitted evidence of prior "faked" logs because "it tended to prove that the trucking company operated with conscious indifference to its federal mandated duty and also because its behavior sent a message to the drivers that violating hours of service regulations was acceptable." However, the district court in *Trotter* did not consider the propriety of the admission of prior "faked" logs in a jury trial for negligence, but was reviewing the defendants' motion for summary judgment on a request for punitive damages filed by plaintiffs against the defendant trucking company. *Trotter*, 2006 WL 1004882, at *1.

¶ 95     The district court noted that the deposition testimony revealed the trucking company's method for reviewing the logs was inadequate for the last five to seven years, the managers would regularly schedule drivers with minimal time for breaks, and that " '[m]oney took precedent [*sic*] over safety.' " *Trotter*, 2006 WL 1004882, at *5-7. The court also found that the evidence showed a pattern of "conscious indifference" to the federal regulations. *Trotter*, 2006 WL 1004882, at *7. As a result, the district court denied the defendants' motion for summary judgment because reasonable jurors could find that the imposition of damages based on aggravating circumstances was warranted.

¶ 96     Plaintiffs' reliance on *Trotter* is misplaced, because in that case plaintiffs were seeking punitive damages and would have to prove the trucking company's knowing or conscious disregard of the federal regulations at trial in order to recover those special damages. The question of whether the court should have allowed introduction of prior log violations evidence was never visited by the court.

¶ 97     In *Thompson*, the reviewing court affirmed the admission of prior bad acts at trial because the defendant's mental state was an issue at trial. There, the plaintiff filed a negligence action against the defendant following an incident in which the parties repeatedly cut each other off and stopped their vehicles in front of the other on the Eisenhower Expressway which culminated in the defendant shooting the plaintiff twice. At trial, the defendant raised two affirmative defenses, contributory negligence and self-defense, arguing that he shot the plaintiff after the plaintiff and his passenger approached him while armed with a baseball bat

and a tire iron and began to strike him. Illinois recognizes the doctrine of self-defense as a defense in both criminal and civil cases. The trial court admitted evidence of a similar incident in which the defendant also displayed a gun after cutting another driver off on a highway. *Thompson*, 294 Ill. App. 3d at 1031-34.

¶ 98    On appeal, the reviewing court observed that "[b]y bringing his cause of action grounded in allegations of negligence, the plaintiff in this case obviated the need to plead or prove the defendant's motive or intent as he would have been obliged to do had he chosen to seek recovery for a battery." *Thompson*, 294 Ill. App. 3d at 1035-36. "However, by pleading self-defense as an affirmative defense to the plaintiff's action, the defendant introduced his mental state as an issue in controversy, as self-defense necessarily involves the question of the defendant's subjective belief and intent at the time of the incident." *Thompson*, 294 Ill. App. 3d at 1036. The reviewing court found the witness's testimony about the defendant's prior bad acts to be relevant to the defendant's state of mind and intent when he shot the plaintiff and also whether the defendant introduced the gun as a measure of self-defense or "an instrument of aggression." *Thompson*, 294 Ill. App. 3d at 1036.

¶ 99    However, the *Thompson* court recognized that the trial court must still determine whether the probative value of the prior bad acts substantially outweighed the prejudicial effect. The reviewing court held that the trial court did not abuse its discretion in admitting the evidence of prior bad acts. The court determined that "the risk of unfair prejudice to the defendant was minimal in comparison to its probative worth" and the witness testimony was relevant to the issue of the defendant's state of mind, especially given the high degree of similarity between the road encounters. *Thompson*, 294 Ill. App. 3d at 1038.

¶ 100   In contrast with *Thompson*, Reeves' mental state at the time of the accident was not a question before the jury. Plaintiffs had filed a negligence action against defendants and no affirmative defense placed Reeves' mental state at issue. Thus, plaintiffs were not required to prove the defendants' motive, intent, or knowledge. See *Thompson*, 294 Ill. App. 3d at 1035-36.

¶ 101   As in *Kruppe*, the same danger of overpersuasion was present in this case, given the circumstances of the accident and closeness of the evidence. The cases we previously reviewed, *Salo*, *Hale*, *Johnson*, *Coole*, and *Steurer*, all illustrate that the facts of this case were extremely close and the jury could have decided either way. Similar to *Hale*, in which the defendant's young son was killed, and the reviewing court expressed concern that the jury may have been swayed by sympathy (see *Hale*, 129 Ill. App. 2d at 475), this case involved the tragic and untimely deaths of three young people due to a traffic collision involving an allegedly fatigued, speeding truck driver carrying some 80,000 pounds of milk product. Given these highly charged facts, the admission of the prior bad acts of speeding and log falsifications required a careful weighing of the probative value of this evidence against the prejudicial impact it would have had upon the fact finder, which we find was not done in this case. In the instant case, plaintiffs' wrongful death actions were based upon negligence claims. Reeves' prior bad acts had no connection to the question of whether he was negligent at the time of the accident. There was no claim for an intentional tort or punitive damages to merit the introduction of the prior log violations. Contrary to plaintiffs' argument, the introduction of prior misconduct was not used for any proper purpose.

¶ 102    Further, the evidence of the prior bad acts, *i.e.*, prior speeding, prior violation of federal regulations, and the $10,000 fine, had no purpose other than to allow the inference that defendants acted badly at the time of the accident because they had done so prior to the accident. The record fails to establish that the evidence of prior bad acts was offered for an admissible purpose, such as purpose, intent, motive, knowledge or other mental state. As previously noted, the intent, mental state, or knowledge of any of the defendants was not at issue in this negligence action.

¶ 103    We also disagree with plaintiffs' assertion that the evidence of prior bad acts was admissible because during opening statements defense counsel stated that Reeves "wasn't falsifying his logs." Plaintiffs contend that this statement opened the door to evidence that Reeves had previously falsified his logs. Defendants maintain that the comment was not referring to prior log entries, but was discussing his log for the week of the accident. Defendants do not dispute the admissibility of evidence relating to Reeves' logs for the week of the accident and the 70-hour rule.

¶ 104    Plaintiffs cited *Young v. Rabideau*, 821 F.2d 373, 380 (7th Cir. 1987), and *Hamrock v. Henry*, 222 Ill. App. 3d 487, 494-95 (1991), to support their argument that the comment in opening statements opened the door for the admission of the prior bad acts. However, in both of those cases, the plaintiffs opened the door for additional evidence during their own testimony. See *Young*, 821 F.2d at 380 (prisoner's testimony that he grabbed a guard's chain by reflex opened the door for the prison guards to contradict this testimony with his prior prison disciplinary record); *Hamrock*, 222 Ill. App. 3d at 494-95 (plaintiff opened the door for defendants to question her about her collateral source of pension funds when she testified that she was referred to a physician by the pension board). Plaintiffs have not cited any authority in which an attorney's comment in opening statements made inadmissible evidence relevant and admissible.

¶ 105    Moreover, the evidence of prior bad acts was not admissible to show a "crime of dishonesty." "In Illinois a witness's credibility may not be impeached by inquiry into specific acts of misconduct which have not led to a criminal conviction." *Podolsky & Associates L.P. v. Discipio*, 297 Ill. App. 3d 1014, 1026 (1998) (citing *People v. West*, 158 Ill. 2d 155, 162-64 (1994)). Here, the prior log violations and the subsequent fine did not lead to a criminal conviction, but only a finding of a violation of federal regulations and were not admissible for purposes of impeachment.

¶ 106    Because the case was close on the facts and the jury could have decided either way, we cannot say that the error did not affect the jury's verdict. Whether Reeves was speeding and whether he was fatigued were two of the most hotly contested issues in the case. As to speeding, the plaintiffs' experts opined that Reeves was traveling at 49.5 miles per hour at impact. However, the defendants' expert testified that Reeves was driving at a speed of 41.5 miles per hour just prior to the collision and at 37 miles per hour at impact. The speed of Reeves' truck was a crucial fact determination and the introduction of this inadmissible evidence of speeding on dates prior to the accident was not harmless.

¶ 107    On the issue of fatigue, Reeves testified that he was not fatigued and the initial responding officer testified that he did not notice that Reeves was fatigued. In contrast, Hess opined that Reeves was fatigued based in part on the log evidence from the relevant time that showed Reeves was driving more than the 70-hour rule allowed. The evidence of the fine was also

- 24 -

unfairly prejudicial because it carried with it the imprimatur of the government. The wrongful admission of the prior log falsifications and fine were not harmless errors.

¶ 108    The dissent relies on several cases from other jurisdictions to support the admission of a truck driver's logs in negligence cases. However, all of the cases cited in the dissent involved the issue of punitive damages in which the truck driver and/or his employer's state of mind was at issue to prove a wanton disregard for the safety of others or intentional misconduct. Further, these cases can be factually distinguished from the circumstances present in this case.

¶ 109    In *Torres v. North American Van Lines, Inc.*, 658 P.2d 835 (Ariz. Ct. App. 1982), the plaintiffs' decedent was killed when a truck driven by a North American driver struck the rear end of the decedent's vehicle while parked in the emergency lane of the freeway. The driver's logs, including his repeated failure to include one item, was admitted at trial on the issue of gross negligence for punitive damages and the reviewing court found that the jury could have concluded "this manifested a wanton disregard for the safety of others, that is, gross negligence." *Torres*, 658 P.2d at 839.

¶ 110    In *Purnick v. C.R. England, Inc.*, 269 F.3d 851 (7th Cir. 2001), the Seventh Circuit was reviewing the district court's grant of summary judgment in favor of the defendants on the issue of punitive damages. There, the defendants' truck driver rear-ended the plaintiff, stating that he had been "mesmerized" by the road prior to impact. The plaintiff's experts asserted that the driver had falsified his logs. However, the reviewing court held that the plaintiff had failed to meet her burden "by clear and convincing evidence that the defendant engaged in conscious and intentional misconduct that he knew would probably result in injury," finding that even if the driver falsified his logs and was fatigued, he did not know that his actions would result in injury. *Purnick*, 269 F.3d at 852.

¶ 111    In *Librado v. M.S. Carriers, Inc.*, No. 3:02-CV-2095-D, 2004 WL 1490304 (N.D. Tex. June 30, 2004), the district court denied the defendants' partial motion for summary judgment on the issue of gross negligence. In that case, the truck driver ran a stop sign while looking at a map and struck the vehicle driven by the plaintiffs' decedent and another passenger. The defendant trucking company admitted liability for negligence and negligence *per se*, but only contested the claim of gross negligence. *Librado*, 2004 WL 1490304, at *1. Under Texas law, "[e]vidence of simple negligence is not enough to prove either the objective or subjective elements of gross negligence." *Librado*, 2004 WL 1490304, at *2. The district court found a question of material fact on the issue of gross negligence and that the driver's prior log violations were relevant to the employers' knowledge and failure to discipline, "consciously indifferent to the effect on others." *Librado*, 2004 WL 1490304, at *4.

¶ 112    In *Briner v. Hyslop*, 337 N.W.2d 858 (Iowa 1983), the truck driver was intoxicated, fell asleep while driving and his truck drifted over the center line, striking the vehicle driven by the plaintiff's decedent. After a trial, the jury entered awards of compensatory and punitive damages against both defendants, but the trial court entered a judgment notwithstanding the verdict as to the award of punitive damages against the defendant employer. On appeal, the Iowa Supreme Court reversed and remanded for a new trial on the issue of punitive damages, finding that it was a jury question as to whether the employer failed to supervise and disregarded the driver's actions of driving excessive hours without sufficient rest. *Briner*, 337 N.W.2d at 867-68.

- 25 -

¶ 113    In *Smith v. Printup*, 866 P.2d 985 (Kan. 1993), the defendant driver was driving a moving van when he lost control, the vehicle jack-knifed, crossed the median and struck the vehicle driven by plaintiffs' decedents. On appeal, the Kansas Supreme Court held that the trial court erred in excluding evidence that the defendant employer had knowledge of the driver's history of log falsification and other service violations from the jury's determination of punitive damages and remanded for further proceedings on punitive damages. *Smith*, 866 P.2d at 1006-07.

¶ 114    In *Elbar, Inc. v. Claussen*, 774 S.W.2d 45 (Tex. App. 1989), the appellees' decedent lost control of his motorcycle and died after a truck driven by the appellants' driver crossed into the decedent's lane of traffic. The reviewing court held that the employer's noncompliance with federal regulations was properly admitted for the jury's determination of gross negligence. *Elbar*, 774 S.W.2d at 51.

¶ 115    In *Came v. Micou*, No. 4:04-CV-1207, 2005 WL 1500978 (M.D. Pa. June 23, 2005), the district court considered the partial motion for summary judgment filed by the defendants regarding the issues of punitive damages. There, the plaintiff alleged that the defendant trucking company's tractor-trailer operated by the defendant driver rear-ended the tractor-trailer operated by the plaintiff. The court found a genuine issue of material fact existed as to whether the defendant driver violated the federal regulations, including "whether Defendants' conduct was so outrageous as to warrant an award of punitive damages in this case." *Came*, 2005 WL 1500978, at *5.

¶ 116    None of these cited cases involved a truck driver on a preferential highway colliding with a driver crossing from a non-preferential road. In each case, the defendant truck driver was clearly at fault for the accident. Each of these cases involved a determination of punitive damages in which the defendants' knowledge and state of mind was at issue. Such a determination is not present in this case because plaintiffs alleged survival and wrongful death counts in negligence, and no claim for punitive damages was raised. Moreover, the question of whether to allow evidence of prior bad acts on a negligence count was never addressed in these cases. Further, we point out that Reeves' driving logs for the week of the accident were properly admitted and that has not been challenged on appeal.

¶ 117    We conclude that the improper admission of the evidence of prior bad acts, specifically the prior speeding, prior log violations, and prior fine occurring weeks and months before the accident were substantial errors that may have tipped the scales in favor of plaintiffs. Accordingly, we find that the trial court abused its discretion in admitting the evidence of prior bad acts, we reverse the judgments in plaintiffs' favor and we remand for a new trial without the use of the improperly admitted evidence.

¶ 118    Defendants also assert that the trial court abused its discretion in giving the "careful habits" instruction after plaintiffs admitted that Chakonas was at least 25% of the proximate cause of the accident. Plaintiffs respond that the instruction was properly given because they had presented evidence that Chakonas was a person of careful habits and none of the witnesses at trial testified as to the complete movement of Chakonas' car from the stop sign and into the intersection.

¶ 119    "In Illinois, the parties are entitled to have the jury instructed on the issues presented, the principles of law to be applied, and the necessary facts to be proved to support its verdict." *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 505 (2002). "The trial court has discretion to

- 26 -

determine which instructions to give the jury and that determination will not be disturbed absent an abuse of that discretion." *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002). "A reviewing court ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant." *Schultz*, 201 Ill. 2d at 274. "The function of jury instructions is to convey to the jury the correct principles of law applicable to the submitted evidence and, as a result, jury instructions must state the law fairly and *distinctly* and must not mislead the jury or prejudice a party." (Emphasis in original.) *Dillon*, 199 Ill. 2d at 507.

¶ 120    During the jury instruction conference, plaintiff Chakonas requested IPI Civil (2006) No. 10.08, "Careful Habits as Proof of Ordinary Care," instruction be given. This instruction informed the jurors that if evidence had been presented that the decedent was a person of careful habits, then it could infer that she exercised ordinary care at the time of the accident.

¶ 121    Defense counsel objected to this instruction because there were "ample eyewitnesses" who testified and plaintiffs admitted some degree of fault for the accident on Chakonas' part. Chakonas' attorney responded there were witnesses to "bits and pieces" but there was no one witness who observed the entire period in which the decedent was in the exercise of ordinary care. Defendants' attorney argued that the entire occurrence was witnessed "not only by Mr. Reeves, but Miss Solma, and Mr. Reid also saw what occurred, as did Mr. Youngreen in terms of the events leading up to and immediately after this event." Chakonas' attorney maintained that none of these witnesses observed the entire incident from the time when Chakonas was stopped at the stop sign until the accident occurred. The trial court ruled that the instruction would be given over the defense objection.

¶ 122    The IPI Civil (2006) No. 10.08, "Careful Habits as Proof of Ordinary Care," instruction provides:

> "If you decide there is evidence tending to show that the decedent was a person of careful habits, you may infer that [she] was in the exercise of ordinary care for [her] own safety at and before the time of the occurrence, unless the inference is overcome by other evidence. In deciding the issue of the exercise of ordinary care by the decedent, you may consider this inference and any other evidence upon the subject of the decedent's care."

¶ 123    The notes on use for this instruction indicate that "[t]his instruction can be given in a negligence or willful and wanton action based on the Wrongful Death Act when there are no witnesses to the occurrence, other than the defendant, covering the entire period in which the decedent must be in the exercise of ordinary care." IPI Civil (2006) No. 10.08, Notes on Use.

¶ 124    Plaintiffs respond that Illinois courts have adopted Federal Rule of Evidence 406, which allows for the admission of habit evidence regardless of eyewitness testimony. Plaintiffs are correct. The Illinois Supreme Court adopted Federal Rule 406 in September 2010 as part of the Illinois Rules of Evidence. Illinois Rule of Evidence 406 provides:

> "Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." Ill. R. Evid. 406 (eff. Jan. 1, 2011).

¶ 125    However, allowing the admission of habit evidence does not automatically mean that the jury instruction should have been given. "A reviewing court ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant." *Schultz*, 201 Ill. 2d at 274. "Generally, if a verdict is tainted by an erroneous instruction then the entire verdict is called into question, unless the instruction pertains to the issue of damages." *Graham v. Northwestern Memorial Hospital*, 2012 IL App (1st) 102609, ¶ 42.

¶ 126    "It is beyond contention that contributory negligence affects the apportionment of liability, not the calculation of damages." *Graham*, 2012 IL App (1st) 102609, ¶ 42 (citing *Alvis v. Ribar*, 85 Ill. 2d 1, 25 (1981)). "Section 2-1116 of the Code of Civil Procedure [citation] bars a plaintiff 'whose contributory negligence is more than 50% of the proximate cause of the injury or damage for which recovery is sought' from recovering any damages. [Citation.]" *Coole*, 384 Ill. App. 3d at 396 (citing 735 ILCS 5/2-1116 (West 1994)). "A plaintiff is contributorily negligent when he or she acts without the degree of care that a reasonably prudent person would have used for his or her own safety under like circumstances and that action is the proximate cause of his or her injuries." *Coole*, 384 Ill. App. 3d at 396. The issue of contributory negligence is a question of fact for the jury. *Coole*, 384 Ill. App. 3d at 396.

¶ 127    Plaintiffs admitted that Chakonas was contributorily negligent and was part of the proximate cause of the accident. The careful habits instruction contradicts this admission by allowing the jury to infer that Chakonas exercised ordinary care prior to the collision. This is wholly inconsistent with the position taken at trial by all plaintiffs that Chakonas was in fact not in the exercise of due care but rather was contributorily negligent. The issue was how much did her negligence contribute to the cause of the accident. The attorney for Powell and Kakidas argued during closing arguments for the jury to find Chakonas 25% to 35% at fault for the accident. Chakonas' attorney likewise asserted that Chakonas was 25% contributorily negligent for the accident. Further, this instruction was inconsistent with her attorney's comment in closing arguments that Chakonas "should not have attempted to cross that street until that truck has passed." Both attorneys admitted that Chakonas made a mistake in her decision to enter the intersection. It was inconsistent to then instruct the jury that it could find she was in the exercise of due care while at the same time the plaintiffs were admitting her contributory negligence. The issue before the jury was not whether she stopped at the stop sign, as perhaps she normally did, but whether it was safe for her to cross Route 30 at that time.

¶ 128    We find that the instruction misled the jurors by instructing that they could infer that Chakonas exercised due care, despite the admission that she was contributorily negligent. This instruction was erroneous and may well have erroneously affected the allocation of fault by the jury. Therefore, the trial court abused its discretion in giving the careful habits jury instruction.

¶ 129    We next review Dean Foods' contention that the trial court abused its discretion in refusing to give its proposed jury instruction regarding the burden of proof for agency. During the jury instruction conference, defendant Dean Foods submitted an instruction to explain the burden of proof on Dean Foods' agency.

¶ 130    The proposed instruction, a modified version of IPI Civil (2006) No. B21.02, stated:
          "If you find that the plaintiffs have proved the propositions required of them as to Jaime Reeves, Alder Group, Inc., and Alco of Wisconsin, Inc., you must then determine whether Jaime Reeves was an agent of Dean Foods Co., Inc.

> If you find from your consideration of all the evidence that the plaintiffs have not proved that Jaime Reeves was an agent of Dean Foods Co., Inc., then your verdict should be for Dean Foods Co., Inc.
>
> If you find that the plaintiffs have proved each of the propositions they are required to prove against Jaime Reeves, Alder Group, Inc. and Alco of Wisconsin, Inc., and have further proved that Jaime Reeves was the agent of Dean Foods Co., Inc., then your verdict should be for the plaintiffs and against Dean Foods Co., Inc."

¶ 131    Plaintiffs objected to this instruction, arguing that it was duplicative of other instructions on the burden of proof and that the instruction was incomplete because it only considered whether Reeves was an agent, but did not address whether he was in a joint venture with Dean Foods or an independent contractor. The trial court agreed with plaintiffs and found that other instructions sufficiently explained the burden of proof and agency. The proposed instruction was denied over Dean Foods' objection.

¶ 132    The trial court instructed the jury on the definition of the burden of proof with IPI Civil (2006) No. 21.01, as follows:

> "When I say that a party has the burden of proof on any proposition, or use the expression 'if you find,' or 'if you decide,' I mean you must be persuaded, considering all the evidence in the case, that the proposition on which he has the burden of proof is more probably true than not true."

¶ 133    The trial court also gave the IPI Civil (2006) No. 20.01 instruction on plaintiffs' burden of proof regarding the negligence claims. The court further instructed the jury with IPI Civil (2006) Nos. 50.03 and 50.10, which defined agency and independent contractor and set forth what was needed to prove the existence of a principal and agent relationship. These instructions included the following language:

> "If you find that the Defendant Jaime Reeves was the agent of the Defendant Dean Foods Company at the time of the occurrence and if you find Jaime Reeves is liable, then all Defendants are liable. If you find that Jaime Reeves is not liable, then no Defendant is liable."

¶ 134    As previously observed, "[t]he trial court has discretion to determine which instructions to give the jury and that determination will not be disturbed absent an abuse of that discretion." *Schultz*, 201 Ill. 2d at 273.

¶ 135    Here, the burden of proof remained on plaintiffs to prove not only that defendants were negligent, but also to prove that Reeves was acting as an agent of Dean Foods. " 'The burden of proving the existence of an agency relationship and the scope of authority is on the party seeking to charge the alleged principal.' " *Daniels*, 382 Ill. App. 3d at 75 (quoting *Anderson v. Boy Scouts of America, Inc.*, 226 Ill. App. 3d 440, 444 (1992)). The instructions, as given to the jury, did not state that it was plaintiffs' burden to prove that Reeves was an agent of Dean Foods. " '[I]t is essential that jurors receive a definition or description of the applicable burden of proof.' " *In re Timothy H.*, 301 Ill. App. 3d 1008, 1016 (1998) (quoting *Rikard v. Dover Elevator Co.*, 126 Ill. App. 3d 438, 441 (1984)). Further, "[a] trial court's nondescription of the applicable burden of proof cannot be harmless because the jury's deliberations, findings, and ultimate decision were rendered through an improper scope of analysis." *Timothy H.*, 301 Ill.

App. 3d at 1016. We conclude that it was reversible error not to give an instruction on the burden of proof on the issue of Dean Foods' agency.

¶ 136    The evidence presented came not from the principal but from inferences drawn from circumstances surrounding other facts. The evidence of agency was based on the testimony of Reeves, Ayen and White, along with statements in the drivers' manual referring to Dean Foods, and the use of the Dean Foods logo on the tractor and trailer and stationary. No evidence was presented that Dean Foods had any control over Reeves' schedule or his conduct. Ayen testified that he was responsible for setting Reeves' schedule. Both Ayen and White were responsible for overseeing Reeves' logbooks and compliance with federal regulations. None of the witnesses at trial was an employee or representative of Dean Foods.

¶ 137    Although there was some evidence from which to infer an agency relationship, there was never any direct proof that Dean Foods controlled the agent. IPI Civil (2006) No. 21.01 simply defined the burden, more probably true than not, but it did not allocate the burden. IPI Civil (2006) No. 20.01 related to the burden of proof on negligence only. Similarly, IPI Civil (2006) No. 50.03 instructed the jury that if it found Reeves was Dean Foods' agent at the time of the accident and found Reeves' liable, then it should find Dean Foods liable. Dean Foods' proposed instruction explained that the burden was on plaintiffs to establish an agency relationship. The failure to give an applicable burden of proof instruction is not harmless. See *Timothy H.*, 301 Ill. App. 3d at 1016. Therefore, the trial court's refusal to give Dean Foods' instruction to the jury deprived Dean Foods of a fair trial.

¶ 138    Defendants also argue that the jury's finding that Christina Chakonas was 40% contributorily negligent was against the manifest weight of the evidence. Because we have already remanded the case for a new trial, we need not reach the merits of this issue.

¶ 139    Finally, defendants contend that the jury's award of damages was excessive and the trial court erred when it denied their motion for remittitur. Defendants also request a new trial because the record showed that the verdicts were, in part, a result of the passion and prejudice against defendants based on the improper admission of the prior bad acts evidence.

¶ 140    Since we have already concluded that the trial court erred in admitting evidence of defendants' prior bad acts and committed instructional errors and we have remanded the case for a new trial, including the issue of damages, we do not need to reach the merits of this issue.

¶ 141    In a petition for rehearing, plaintiffs contend that the evidence of prior speeding and log violations was relevant because they had alleged direct liability against Alco in the complaint. However, our review of the record, particularly the jury instructions, shows that the jury was not charged with determining any direct liability by Alco, but that Alco and Dean Foods were vicariously liable for the actions of Reeves, their agent. Further, the evidence of prior speeding and log violations has no relationship to the allegations of negligence set forth to the jury, such as whether Reeves failed to keep a proper lookout, whether Reeves failed to operate to operate the truck at a reasonable speed with regard to actual and potential hazards, whether he was speeding, whether he failed to reduce his speed to avoid a collision, and whether he was fatigued at the time of the accident. We still fail to see, even assuming that Reeves falsified logs as opposed to Reeves' own statements that he made mistakes and other testimony that the fine imposed was not solely a result of Reeves' errors, how those facts could possibly support these negligence allegations. We do not accept the suggestion that the lawyer for Alco and

Reeves would bring up the subject of the prior log violations without the trial judge having previously indicated that she would permit this evidence at the trial.

¶ 142 Based upon all of the above, we reverse the verdicts in favor of plaintiffs and remand for a new trial consistent with this opinion.

¶ 143 Reversed and remanded.

¶ 144 JUSTICE PALMER, specially concurring.

¶ 145 I concur in the judgment of this court in all respects. *Inter alia*, this court holds today that the trial court abused its discretion and committed error when it gave to the jury the "careful habits" instruction found in IPI Civil (2006) No. 10.08. We held that the instruction misled the jury by instructing that they could infer that the driver exercised due care, despite the admission that she was contributorily negligent. See *supra* ¶¶ 118-28.

¶ 146 I write separately, however, to express some doubts that I have concerning the continued viability of the concept of "careful habits" evidence and thus the use of IPI Civil (2006) No. 10.08 in any case.

¶ 147 In his treatise on Illinois evidence, Professor Graham traces the historical roots of "careful habits" testimony:

> "The Illinois requirement, now abolished ***, that plaintiff in a negligence action plead and prove freedom from *contributory negligence* was applied to wrongful death actions. Accordingly, a plaintiff personal representative was confronted with a difficult problem of proof if there were no eyewitnesses to the occurrence. As a means of coping with the problem, case law evolved a procedure of allowing plaintiff to introduce evidence of careful habits of her decedent." (Emphasis added.) Michael H. Graham, Graham's Handbook of Illinois Evidence § 406.2, at 287-88 (10th ed. 2010).

¶ 148 Professor Graham, however, goes on to note that the necessity for this special procedure no longer exists with the abolition of the bar to recovery upon a finding of contributory negligence and the advent of our current system of comparative negligence:

> "The decision of the Illinois Supreme Court in *Alvis v. Ribar*, 85 Ill. 2d 1, 52 Ill. Dec. 23, 421 N.E.2d 886 (1981), abolishing contributory negligence ***, removed the necessity of plaintiff's offering careful habits testimony in its case in chief in order to avoid a directed verdict." Graham, *supra* § 406.2, at 289.

¶ 149 That being said, I believe that the term "careful habits" is actually a misnomer. This type of evidence is actually more akin to character evidence as opposed to habit evidence. Graham points out that "[w]hile habit, in contrast to character, may be defined as a settled way of doing a particular thing, [citation], the dividing line between habit and character is far from distinct." Graham, *supra* § 406.1, at 286.

> " 'Habit' is more specific than 'character.' Character is a generalized description of one's disposition or of one's disposition in respect to a particular trait, such as honesty, temperance, or peacefulness." Graham, *supra* § 406.1, at 287.

¶ 150 I would add to that list of generalized dispositions the trait of carefulness. Professor Graham goes on to say:

- 31 -

"Evidence of a person's character or a trait of his character for the purpose of proving that he acted in conformity therewith on a particular occasion is not admissible in civil cases \*\*\*." Graham, *supra* § 406.1, at 287.

Indeed, our now-adopted Illinois Rules of Evidence provide that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Ill. R. Evid. 404(a) (eff. Jan. 1, 2011).

¶ 151 Professor Graham contrasts habit evidence as follows:

"On the other hand, \*\*\* a person's habit or the routine practice of an organization is admitted as tending to establish that conduct on a particular occasion was in conformity therewith. Habit describes one's regular response to a repeated *specific* situation so that doing the habitual act becomes semiautomatic and extremely regular." (Emphasis added.) Graham, *supra* § 406.1, at 287.

¶ 152 Our now-adopted Illinois Rules of Evidence provide for habit evidence as follows:

"Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." Ill. R. Evid. 406 (eff. Jan. 1, 2011).

¶ 153 Of importance here, Professor Graham goes on to note that "[e]vidence that one is a 'careful man' is lacking the specificity of the act becoming semiautomatic and extremely regular; it goes to character rather than habit." Graham, *supra* § 406.1, at 287.

¶ 154 Always putting a stamp on an envelope after addressing it and before mailing it is a habit, a response to a repeated *specific* situation. I believe that being a careful driver is not a response to a repeated *specific* situation but rather a more generalized description of a person's character trait. As character evidence I believe it should be inadmissible under our Rule 404(a). Therefore, as the special circumstances that spawned the concept of "careful habits" evidence no longer exist, and as I feel that this is simply character evidence, I believe the concept to no longer be viable and further that IPI Civil (2006) No. 10.08 should be discarded.

¶ 155 However, I must add that as this issue was not raised, briefed or argued by the parties, it has not entered into my decision to concur in this court's judgment.

¶ 156 JUSTICE GORDON, dissenting.

¶ 157 I must respectfully dissent on three issues: (1) the admission of "prior bad acts" evidence admitted against Reeves, Alco of Wisconsin, Inc., and Alder Group, Inc., that the majority finds was improper; (2) the tendering of a "careful habits" instruction to the jury after plaintiffs admitted that the driver, Christina Chakonas, was contributorily negligent in causing the fatal collision, which the majority finds was error; and (3) the burden of proof instructions regarding agency.

¶ 158 A defendant is not entitled to a perfect trial, only a fair trial. *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 855 (2010). As the majority notes, substantial verdicts for three young dead people against defendants were vacated when the majority found that the trial court erred in denying defendant Alder a substitution of judge as a matter of right affected the jury verdicts against all defendants. Our supreme court vacated and reinstated those verdicts against all of the defendants except Alder. Plaintiffs dismissed Alder as a party defendant with prejudice,

and now we must decide defendants' posttrial motions. *Powell v. Dean Foods Co.*, 2012 IL 111714, ¶ 50.

¶ 159                          I. "Prior Bad Acts" Evidence

¶ 160    Defendants argue that the evidence of prior speeding, violations of federal trucking regulations and the $10,000 fine had no purpose other than to foster the legally impermissible inference that defendants acted badly at the time of the collision because they had acted badly prior to the collision. They argue that the fact that Reeves may have been speeding and had falsified his logs prior to the collision made it no more likely that he was speeding at the time of this accident or falsified his log here, and as a result, the trial court abused its discretion in admitting this evidence.

¶ 161    Specifically, defendants argue that there was no proper purpose for informing the jury (1) that Reeves was speeding prior to the accident; (2) that Reeves and Alder violated federal trucking regulations several weeks and months prior to the accident; (3) that Reeves had been found to have falsified driving logs prior to the accident; (4) and that Reeves and Alder had been fined after an audit by the federal government for misconduct in maintaining its trucking logs. As a result, defendants argue that all of this evidence was erroneous, highly prejudicial, and warrants the granting of a new trial.

¶ 162    Evidence of a person's conduct on another occasion generally is not relevant or admissible. *Doe v. Lutz*, 281 Ill. App. 3d 630, 638 (1996); *Plooy v. Paryani*, 275 Ill. App. 3d 1074, 1089 (1995). A court will not consider evidence that a person has, or has not, done a certain act at a particular time as probative of a contention that he has, or has not, done a similar act at another time. *Bevelheimer v. Gierach*, 33 Ill. App. 3d 988, 995 (1975).

¶ 163    However, such evidence may be admissible if offered for some purpose other than as proof of a person's disposition to behave in a certain way. *Wernowsky v. Economy Fire & Casualty Co.*, 106 Ill. 2d 49, 53 (1985). Thus, the admission of evidence of prior similar wrongful conduct to establish purpose, intent, motive, knowledge, *modus operandi*, or other mental state of a party to a civil action, forms an exception to the general rule which prohibits proof of one wrongful act by evidence of the commission of another such act. *Thompson v. Petit*, 294 Ill. App. 3d 1029, 1034-35 (1998).

¶ 164    Plaintiffs claim that Reeves was fatigued because he had driven beyond the hourly limits provided for by the federal motor carrier safety regulations. At trial, plaintiffs introduced evidence that Alco had assigned Reeves a driving schedule that ensured that Reeves would be required to violate federal regulations if he followed that schedule by requiring Reeves to both speed and to drive beyond the maximum hours allowed for truck drivers in an eight-day work period. Plaintiffs also introduced evidence that Reeves' driver logs for the week in question were incorrect and that he was driving in excess of the 70-hour rule at the time of the collision.

¶ 165    This evidence showed that Reeves had the *intention* to falsify his logs and that all of the other defendants had *knowledge* of what he was doing. The majority states in paragraph 102 of its opinion that the intent, mental state, or knowledge of any of the defendants was not at issue in this negligence action. I say it was the major issue of the case.

¶ 166    In the case at bar, Reeves testified that he did not know what happened to the trip ticket for the week ending July 6, 2002 when the accident occurred on July 6, 2002. A trip ticket is

- 33 -

maintained to keep track of miles driven, stops made, and fuel. However, the log maintained by Reeves was produced and is a separate document from a trip ticket.

¶ 167    The prior bad act evidence revealed that, in June 2002, the federal motor carrier compliance inspector performed an audit. Reeves testified that "it was determined he had made some mistakes on [his log]." He denied it was intentional; however, plaintiff argues that the evidence of the audit showed Reeves falsified his logs. Defendants assert that the admission of this evidence was erroneous, highly prejudicial, and warrants the granting of a new trial.

¶ 168    Defendants argue that the evidence of prior speeding, violations of trucking regulations and the $10,000 fine had no purpose other than to foster the legally impermissible inference that defendants acted badly at the time of the collision because they had acted badly prior to the collision.

¶ 169    Plaintiffs maintain that the evidence was properly admitted. The earlier log violations demonstrated Alco's knowledge in scheduling Reeves for long runs and "implicitly" approved of Reeves' driving time violations. Plaintiffs assert that the evidence was properly admitted to show absence of mistake and intent showing that the violations were not accidental.

¶ 170    Plaintiffs further claim that the logbook violations were relevant to Reeves' credibility because it demonstrated his dishonesty and desire to conceal facts which are required to be reported. Plaintiffs additionally claim that the log book violation placed defendants on notice that Reeves was routinely driving over the speed limit and over his maximum allowed hours-of-service, which made it incumbent for defendants not to schedule Reeves for truck runs near 500 miles. Plaintiffs further claim that Reeves' driving habits also placed defendants on notice that Reeves was driving while fatigued.

¶ 171    Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) was modeled after Federal Rule of Evidence 404(b) and provides in its relevant part that "[e]vidence of other crimes, wrongs, or acts *** may *** be admissible for *** purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." "Evidence of crimes, wrongs, or acts other than the one at issue may be admissible if offered for some purpose other than as proof merely of a person's disposition to behave in a certain way." *Wernowsky*, 106 Ill. 2d at 53.

¶ 172    In *Terpstra v. Niagara Fire Insurance Co.*, 256 N.E.2d 536, 539 (N.Y. 1970), the trial court allowed the defendant insurer to introduce plaintiff's admission to the police that earlier fire loss recoveries had given him the idea to commit arson. The previous fire recoveries were admitted to show intent or a plan. *Terpstra*, 256 N.E.2d at 539. Here, the trucking log falsifications were admitted to show absence of mistake and a plan and an intent to drive over the speed limit for long distances in order to meet schedules, thus placing all defendants on notice of this conduct. It showed defendant's *modus operandi*.

¶ 173    In *Thompson v. Petit*, 294 Ill. App. 3d 1029 (1998), the trial court was affirmed when it admitted evidence in a negligence action that the defendant had similarly cut off an individual six years earlier and then smashed his vehicle into the other vehicle. In *Thompson*, the plaintiff was shot by the defendant after a traffic-related argument. *Thompson*, 294 Ill. App. 3d at 1031. The appellate court reasoned that when evidence of prior bad acts is relevant to "the issue of a defendant's state of mind or intent, the prior conduct must be similar to the conduct in issue" in order to be admissible in evidence. *Thompson*, 294 Ill. App. 3d at 1038. In the case at bar, the

- 34 -

prior bad acts of Reeves are identical to the misconduct at issue. Plaintiffs' expert Hess opined that, if Reeves had not been speeding, then he would not have reached the location of the accident at the time he did. He found inconsistencies in Reeves' log as compared to the truck's Detroit Diesel Electronic Controls (DDEC) information known as the "black box," which was frequently at odds with Reeves' daily log for his driving hours. He also found data retrieved from the semitruck's engine control module (ECM) that showed Reeves had reached a speed of 79.5 miles per hour with an average speed of 65.9 miles per hour. Hess concluded that the violations of the federal regulations were the causes of death of plaintiff's decedents. Not only do Reeves' bad acts show an intent to deceive, they show a continued plan to falsify relevant information of speed, distance, and time traveled.

¶ 174        Similarly, in *Oxford Bank & Trust v. Hartford Accident & Indemnity Co.*, 298 Ill. App. 3d 199, 201, 206-07 (1998), the plaintiff bank filed a claim seeking employee dishonesty coverage for its losses from a check-kiting scheme which one of its employees had participated in with a customer. The trial court allowed evidence that, at a bank where the employee had worked previously, dealings between the employee and the same customer had resulted in a loss of money to that bank also. *Oxford Bank & Trust*, 298 Ill. App. 3d at 203. In affirming the trial court, the appellate court specifically rejected the argument that the evidence "only demonstrate[d] that the defendant ha[d] committed bad acts in the past" and held that the evidence was admissible to demonstrate *modus operandi*. *Oxford Bank & Trust*, 298 Ill. App. 3d at 208.

¶ 175        Additionally, in *Reinneck v. Taco Bell Corp.*, 297 Ill. App. 3d 211, 213 (1998), the trial court found in favor of a terminated employee who had sued her former employer, claiming that she was discharged in retaliation for claiming her rights to workers' compensation. The court upheld the trial court's admission of testimony from other former employees of the defendant who were fired after filing workers' compensation claims because it was "directly relevant" to the defendant's motive in terminating the plaintiff. *Reinneck*, 297 Ill. App. 3d at 215.

¶ 176        Like the evidence in *Oxford Bank* and *Reinneck*, the evidence in the case at bar of defendants' prior bad acts was directly relevant to the manner in which defendants operated their business; it showed evidence of motive, intent, plan, and *modus operandi*. So the trial court did not err in admitting it. This conclusion is supported by independent evidence from plaintiffs' expert that Reeves was speeding and driving in excess of the 70-hour rule on the day of the collision at issue.

¶ 177        The evidence here showed that Reeves testified that he did not know what happened to the trip tickets that kept track of his stops, miles driven in each state, and the fuel placed into the truck. The only evidence Reeves was able to produce was his logbooks for his time on the road. Without the weekly trip tickets, there was no check and balance system intact and false entries in a logbook went unverified and were easily subject to manipulation. Plaintiff's expert Hess compared the truck's DDEC data to Reeves' daily log and found that they were at odds. Hess detailed the entire week prior to the accident and compared the DDEC report to Reeves' logs to determine his driving and duty hours. Hess relied exclusively on the DDEC report to form his opinion that Reeves had exceeded the 70-hour rule, found him speeding, fatigued, and responsible for the death of plaintiff's decedents. Hess opined that Reeves violated the federal regulations at the time of the accident. In addition, the data retrieved from the semitruck's

ECM supported Hess's opinion. The ECM showed that the driver of the semitruck's average speed was 65.9 miles per hour and Reeves had reached a speed of 79.5 miles per hour. When one takes into consideration that Reeves failed to produce his trip tickets and that his log entries do not correlate with the DDEC report data or the ECM, the prior actions of Reeves in falsifying his log becomes relevant as to his *modus operandi* and intent in making his trips. It is a reasonable inference that he falsified the logbook so that he could comply with the federal regulations, working in excess of the 70-hour rule, and drove over the speed limit to maintain his schedule. His employer's knowledge of that *modus operandi* is equally relevant to a determination of whether the other defendants were negligent. Therefore, the prior falsified evidence was proper to show *modus operandi*, as well as intent and knowledge of the other defendants.

¶ 178    Plaintiffs cite a federal district court decision from the Southern District of Illinois, *Trotter v. B&W Cartage Co.*, No. 05-cv-0205-MJR, 2006 WL 1004882 (S.D. Ill. Apr. 13, 2006), to support their position that the evidence of prior log violations of truckers is proper evidence in a jury trial for negligence. The *Trotter* court admitted evidence of prior "faked" logs because it tended to prove that the trucking company operated with conscious indifference to its federally mandated duty and also because its behavior sent a message to the drivers that violating hours of service regulations was acceptable. *Trotter*, 2006 WL 1004882. In the case at bar, the majority dismisses *Trotter* as not applicable because the trial court was reviewing defendants' motion for a summary judgment on a request for punitive damages filed by the plaintiffs against the defendant trucking company. *Trotter*, 2006 WL 1004882. The majority concludes that, since plaintiffs were seeking punitive damages, they would have to prove the trucking company's knowing or conscious disregard of the federal regulations in order to recover the punitive damages, and that is why the trial court allowed the prior evidence of falsifying the trucking logs.

¶ 179    The *Trotter* case is close on "all fours" to the case at bar, and the fact that the plaintiff had to prove more than negligence does not give a court authority to bar prior bad acts for that reason. The quantum of proof has never been the consideration of any cases on this subject matter. If evidence is inadmissible, it cannot be considered at all on a motion for summary judgment. *Watkins v. Schmitt*, 172 Ill. 2d 193, 203-04 (1996). Likewise, if evidence is relevant to gross negligence, it certainly should be relevant to negligence. I cannot find any cited cases to substantiate this statement, nor can I find any cases that would support the proposition that prior falsification of log entries can only be admissible into evidence when punitive damages or gross negligence is in issue.

¶ 180    As the majority pointed out:

> "The district court noted that the deposition testimony revealed the trucking company's method for reviewing the logs was inadequate for the last five to seven years, the managers would regularly schedule drivers with minimal time for breaks, and that ' "[m]oney took precedent [*sic*] over safety." ' *Trotter*, 2006 WL 1004882, at *5-7. The court also found that the evidence showed a pattern of 'conscious indifference' to the federal regulations. *Trotter*, 2006 WL 1004882, at *7. As a result, the district court denied the defendants' motion for summary judgment because reasonable jurors could find that the imposition of damages based on aggravating circumstances was warranted." *Supra* ¶ 95.

¶ 181　　　　I agree with the majority that the admission of the prior bad acts of speeding and log falsification required a careful weighing of the probative value of this evidence against any prejudicial impact it would have upon the jury. The rule in admitting prior bad act evidence is set forth in "Trial Evidence" by Mauet and Wolfson, which states:

> "The rule is one of inclusion. It authorizes the admission of a party's conduct that is extrinsic to the matter on trial for any relevant reason other than to prove the party's propensity to do the one thing at issue. It would be indulging in fiction to say that admissible other conduct evidence must be completely free of any propensity taint. A reasonable fact finder might entertain that notion no matter how careful the trial judge is in defining the purpose of the evidence. The mere existence of the possibility of misuse is not enough to bar the evidence if it fits within [Federal Rule of Evidence] 404(b). It is enough to call on the judge to carefully exercise his discretion." Thomas A. Mauet & Warren D. Wolfson, Trial Evidence (4th ed. 2009).

The majority concludes that weighing the evidence as to its probative value against its prejudicial impact was not done in this case, and I find that it was and that it was done properly.

¶ 182　　　　In the case at bar, plaintiffs allege that Reeves was fatigued because he had driven beyond the hourly limits provided for by the federal motor carrier safety regulations. At trial, plaintiffs introduced evidence that Alco of Wisconsin, Inc., had assigned Reeves a driving schedule that ensured that Reeves would be required to violate federal regulations if he followed that schedule by requiring Reeves to both speed and to drive beyond the maximum hours allowed for truck drivers in a eight day work period. The evidence that plaintiff introduced at trial showed that Reeves could not have made his scheduled runs unless he sped and drove in excess of the 70-hour rule. Plaintiffs introduced evidence that Reeves' driver logs for the week in question were incorrect and that he was driving in excess of the 70-hour rule at the time of the collision. Thus, the evidence of Reeves speeding and driving over the 70-hour limit on the week in question was relevant and admissible at trial to show that Reeves was fatigued at the time of the collision, and that the other defendants were aware that his logs were inaccurate and that he was driving over the 70-hour limit per week. The evidence showed that Reeves had the *intent* to falsify his logs and that the other defendants had *knowledge* of his conduct.

¶ 183　　　　Reeves failed to produce his trip tickets as a check and balance to his log entries. That fact is important with all the other facts in this case in order to determine whether the trial court abused its discretion in allowing the admission of the "bad acts" evidence. The trial court allowed the evidence of past log falsification and speeding to show *intent* to speed and make log falsifications so that Reeves could make scheduled runs in the time period that his employer required. It was part of defendant's *modus operandi* and provided all of defendants notice of what Reeves was doing.

¶ 184　　　　The majority is giving the impression that "bad acts" evidence is allowed only in civil cases where punitive damages are at issue. However, punitive damages are not available in wrongful death cases (*Mattyasovszky v. West Towns Bus Co.*, 21 Ill. App. 3d 46, 52 (1974), *aff'd*, 61 Ill. 2d 31 (1975)), and none of the cases cited in this dissent hold that the "bad acts" evidence was admissible solely because punitive damages were claimed. What generally occurs is that plaintiffs in trucking negligence cases normally file a count for punitive damages when they have evidence of prior log falsification. Here, plaintiffs did not do so.

¶ 185    In *Smith v. Printup*, 866 P.2d 985 (Kan. 1993), the Supreme Court of Kansas said the following:

> "Plaintiffs' theory is that Printup had a long history of falsifying his driving logs and inspection reports and that the companies for which he worked had a long history of tolerating such violations. If the jury could find that fatigue due to hours of service violations caused or contributed to the accident, then evidence that the companies knew or had reason to know of Printup's false logs and hours of service violations is relevant to authorization and ratification of conduct that caused or contributed to the accident.
>
> * * *
>
> *** Southwest's historical treatment of Printup's alleged noncompliance with log and hours of service requirements is relevant. Southwest was his employer and had authority to fire him. To the extent Printup's noncompliance was related to fatigue, Red Ball's and Southwest's tolerance of such noncompliance was both relevant and admissible." *Smith*, 866 P.2d at 1005-06.

The Supreme Court of Kansas never indicated that a punitive count is necessary for the admission of prior falsification of logs.

¶ 186    As a matter of course, the conduct of a truck driver in maintaining logs is admitted in evidence in negligence cases throughout the United States where there are allegations of fatigue to show, among other things, that the employer had notice and knowledge of the truck driver's past conduct. In *Torres v. North American Van Lines, Inc.*, 658 P.2d 835 (Ariz. Ct. App. 1982), a wrongful death jury trial, the driver's prior logs for three months were admitted into evidence to show that the driver failed to include a listed item in his log to avoid a determination that he violated the 70-hour rule. The Arizona court never indicated that a punitive count is necessary for the admission of a pattern of incomplete log entries.

¶ 187    In *Purnick v. C.R. England, Inc.*, 269 F.3d 851, 852 (7th Cir. 2001), the trial court admitted evidence that a truck driver falsified logs, drove beyond the 10-hour limit several times in the week before the crash, and was fatigued when he struck the plaintiff solely in a punitive damage case. Our Seventh Circuit never indicated that prior falsified logs are admissible only in punitive damages cases. In *Librado v. M.S. Carriers, Inc.*, No. Civ. A. 3:02-CV-2095-D, 2004 WL 1490304 (N.D. Tex. June 30, 2004), a Texas district court considered the Qualcomm data and driver logs where, in a year, the truck driver committed more than 320 driver log violations and violated the federal hours-of-service regulations. The Texas district court never indicated that prior falsified logs are admissible only in punitive damages cases. In *Briner v. Hyslop*, 337 N.W.2d 858, 867 (Iowa 1983), evidence admitted in the trial court in a wrongful death jury trial verdict included the fact that the truck driver had not kept a log for the three weeks prior to his collision and that he had previously failed to maintain logs to show that the employer had notice and knowledge of the log violations and did nothing about it. The Iowa court never indicated that prior falsified logs are admissible only in punitive damages cases. See also *Elbar, Inc. v. Claussen*, 774 S.W.2d 45 (Tex. App. 1989) (where the truck driver's log admitted in evidence showed that he drove for period of time which violated federal regulations). In *Elbar*, the court stated:

> "Elbar argues that because it was in compliance with D.O.T. regulations, a finding of gross negligence against it was precluded as a matter of law. We disagree. While Elbar maintained at trial that its drivers operated within D.O.T. requirements, there was

also evidence that neither Bullock's nor Ingersoll's driving logs were in compliance with federal regulations and that such inaccuracies made auditing difficult. Additionally, during trial, Elbar's General Manager admitted that Ingersoll was grossly out of compliance with federal regulations and should not have accompanied Bullock on the trip in question. Elbar's claim to be in compliance with federal regulations may constitute evidence that it exercised 'some care' in its operations; however, the jury was entitled to determine what weight to accord that evidence." *Elbar*, 774 S.W.2d at 51.

The *Elbar* court never indicated that prior falsified logs are admissible only in punitive damages cases. See also *Came v. Micou*, No. 4:04-CV-1207, 2005 WL 1500978 (M.D. Pa. June 23, 2005) (where a federal district judge considered in a motion for summary judgment an expert's report that included that a truck driver had been on duty for at least 75.5 hours in the 8 days prior to the collision, and that the driver had previously falsified his truck logs in violation of federal regulations). The Pennsylvania court never indicated that prior falsified logs are admissible only in punitive damages cases.

¶ 188      Although the majority attempts to distinguish cases where the issue is one of punitive damages or gross negligence, the only difference between allowing prior bad acts in a punitive damages case as compared to a compensatory damages case is relevancy. The cases I cite on this subject matter all stand for the proposition that the prior bad acts must be relevant to the issue at hand to be admissible. In the case at bar, the majority does not argue relevancy, nor do the defendants. The issue in the case at bar simply put is whether the prior bad act evidence is being used to prove the character of Reeves to foster the legally impermissible inference that since he acted badly prior to the collision, he must have acted badly at the time of the collision. As I have shown in this dissent, case authority overwhelmingly supports the use of a trucker's past conduct in falsifying log records when independent evidence shows that the log records were incorrect at the time of a collision. That evidence is probative in establishing fatigue and outweighs its prejudicial effect. In the case at bar, Reeves failed to produce his route tickets, claiming they were lost. His logs were impeached by the data from the DDEC and ECM.

¶ 189      The prior bad act evidence here also placed all of the defendants on notice that Reeves was speeding in order to maintain his schedule and gave them notice that he was not maintaining his logs in conformance with federal regulations. But most importantly the bad act evidence was also evidence of the agency relationship between Reeves and the other defendants which was at issue before the trial court and is an issue on this appeal. The evidence of Reeves' previous conduct of falsifying his logs, and speeding in order to meet his employers' schedule, and the fine against the employer showed that all of defendants were aware of this conduct and were responsible. Such evidence was offered for purposes other than Reeves' disposition to behave in a certain way. *Wernowsky v. Economy Fire & Casualty Co.*, 106 Ill. 2d 49, 53 (1985). Its probative value exceeds its prejudicial effect because the same evidence of Reeves' log entries for this accident were not consistent with the information obtained from his truck data from the DDRC and ECM, and plaintiff's expert opined he was speeding. Thus, the bad act evidence could not have been unfairly prejudicial. *People v. Illgen*, 145 Ill. 2d 353, 375-76 (1991). The trial court was within its sound discretion to admit the prior bad acts into evidence and the jury's verdict should not be disturbed.

¶ 190                    A. Defendant Reeves "Opened The Door" to Allow
                              Evidence of His Prior Log Falsifications

¶ 191        The majority finds that a party cannot "open the door" to otherwise potentially inadmissible evidence in its opening statement. See *supra* ¶ 104. To the contrary, there are many instances in our case law where a party was found to have "opened the door" to evidence that would be otherwise inadmissible.

¶ 192        In a personal injury case, *Zadura v. Debish*, 5 Ill. App. 3d 695, 697 (1972), we affirmed the admissibility of evidence of defendant's alcohol consumption prior to an accident, despite the fact that there was no evidence of intoxication. Normally, evidence of alcohol consumption without proof of intoxication is excluded because it may constitute extreme prejudice. However, plaintiff was allowed to explore the subject matter because defendant claimed in his opening statement that he had one beer prior to the accident. In affirming, this court found that "[d]efendant's opening statement was not evidence, but it was heard by the jury and could well have left an impression on them. It was therefore proper to allow plaintiff to put into evidence defendant's admission that he had two drinks." *Zadura*, 5 Ill. App. 3d at 697.

¶ 193        In *People v. Whiters*, 146 Ill. 2d 437, 442-43 (1992), the defendant in a murder trial attacked decedent's good character in his opening statement and during its case in chief. As a result, the State was allowed to offer evidence of the decedent's good character, even though no character evidence was offered by the defense. The court reasoned that "[t]o hold otherwise would enable the defendant to get away with using her opening statement to vilify the victim's character and thus poison the water without offering any supporting evidence." *Whiters*, 146 Ill. 2d at 443. The court further noted that not allowing a response from the prosecution "would defeat the truth-seeking function of a trial." *Whiters*, 146 Ill. 2d at 443.

¶ 194        In the case at bar, the defense "opened the door" to Reeves' prior log falsifications in their opening statement to the jury when defense counsel informed the jury that "the evidence will show, ladies and gentlemen, that he wasn't falsifying his logs." Defense counsel then focused on Reeves' character by informing the jury twice that the "only thing [Reeves] is guilty of is trying to do his job," and that "this man was a good man." It is also important to note that the defense continued to talk about Reeves' character during their closing argument, arguing that this case was "about [Reeves'] future," that the jury was "judging" Reeves and that "cases like this, these do have consequences. *** He's a human being and these companies are human beings."

¶ 195        In addition, the defense brought out in Reeves' direct testimony that he "always report[ed] [his] logs accurately." Defense counsel asked, "Now sir, you always report your logs accurately, am I correct?" Reeves answered, "That is correct." That direct testimony further opened the door and, as a result, Reeves' prior falsifications were admissible to refute his testimony that his logs were always accurate. *People v. Harris*, 231 Ill. 2d 582, 588-90 (2008) (defendant opened the door to other crimes by testifying " 'I don't commit crimes' "). Further, plaintiff had the right to impeach Reeves with the prior falsifications once he testified that he always reported his logs accurately. Ill. S. Ct. R. 238 (eff. Apr. 11, 2001) ("[t]he credibility of a witness may be attacked by any party").

¶ 196                    B. Defendant Failed to Object or Perfect a Continuing Objection

- 40 -

¶ 197    In addition, the defense waived any error in the admission of Reeves' log falsification by failing to object or request a limiting instruction. The majority states, "[d]efense counsel objected to the admission of the prior violation [prior to trial] and stated that he would make a continuing objection at trial." *Supra* ¶ 84. However, the defense never objected or made a continuing objection when questions concerning the log falsification were asked. The trial court could not accept a continuing objection when one was not made.

¶ 198    After opening statements, the trial court ruled that it was going to allow the prior log violations to be admitted into evidence. After this ruling, defense counsel acknowledged that "we know we have to make an objection during the testimony of the witness." The following discussion occurred before the court:

> "ATTORNEY FOR DEFENDANT: [W]e just want to make sure that we just say, 'Objection, your Honor,' and we understand your prior ruling, and sit down. Would that be–
>
> ATTORNEY FOR PLAINTIFF: That would be a continuing objection.
>
> THE COURT: Yes, that's fine with the court. I do not want you to verbalize it.
>
> ATTORNEY FOR DEFENDANT: Just, 'Continuing objection, your Honor,' and I will sit down."

¶ 199    Notwithstanding that discussion, the record is clear that defendants never requested a "continuing objection" to the testimony that would obviate the need to object. A "continuing objection" will not preserve any error unless the trial court recognizes the continuing objection. *Fleming v. Moswin*, 2012 IL App (1st) 103475-B, ¶ 96. Here, defendant did not request a continuing objection, but merely asked how to phrase his objection to the court during testimony. Thus, no continuing objection was requested, or recognized by the court, and the mere suggestion that a continuing objection might be requested in the future was not sufficient to preserve defendants' claim of error.

¶ 200    The denial of defendants' motion *in limine* does not preserve any claimed error for review. *Schuler v. Mid-Central Cardiology*, 313 Ill. App. 3d 326, 333-34 (2000). Therefore, it was incumbent on defendants to object to any evidence of prior log falsification each and every time it was introduced if they were to challenge the admission of that evidence. *Gillespie v. Chrysler Motors Corp.*, 135 Ill. 2d 363, 374 (1990). Defendants did not formally object or make a continuing objection to the trial court, as they agreed to do during the discussions with the trial court and plaintiff's counsel.

¶ 201              C. Prior Log Falsifications and Prior Speeding Are Admissible
                                        Against Defendant Alco

¶ 202    Plaintiffs' complaint alleges that defendant Alco, which was defendant Reeves' employer, was negligent for violating the Federal Motor Carrier Safety Regulations, specifically section 392.6, which provides:

> "No motor carrier shall schedule a run nor permit nor require the operation of any commercial motor vehicle between points in such period of time as would necessitate the commercial motor vehicle being operated at speeds greater than those prescribed by the jurisdictions in or through which the commercial motor vehicle is being operated." 49 C.F.R. § 392.6 (2002).

¶ 203     On the day of this collision, defendant Reeves began driving at 8:30 a.m. and was involved in the collision approximately 13 hours later. Reeves' runs in the days preceding this collision exceeded 730 and 1,000 miles. The evidence adduced at trial showed that Alco was repeatedly scheduling Reeves for runs that would require him to either violate the speed limit or the hours he drove. As a result, Reeves' prior log falsifications were admissible to show that Alco had notice that its scheduling was causing Reeves to speed and/or violate his allowable hours of driving, and that Alco was not complying with section 392.6. Consequently, the trial court correctly admitted Reeves' prior falsification to show intent which was relevant to plaintiffs' claims that Alco violated section 392.6.

¶ 204                          II. The "Careful Habits" Jury Instruction

¶ 205     "The trial court has discretion to determine which instructions to give the jury and that determination will not be disturbed absent an abuse of that discretion." *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002). The majority finds that the careful habits jury instruction here misled the jurors by instructing them that they could infer that Chakonas, the driver, exercised due care, despite the admission that she was contributorily negligent. The majority concludes that the instruction may well have erroneously affected the allocation of fault by the jury. Well, anything could be possible and the term "may well have" means possible. In fact, Webster's defines "may" as "used to indicate possibility." Merriam-Webster's Collegiate Dictionary 767 (11th ed. 2006). The majority basically adopts the arguments of defendants, who argue that the "careful habits" instruction given to the jury was error because: (1) the instruction can only be given in the absence of eyewitness testimony regarding the incident leading to a wrongful death action, and (2) plaintiffs' counsel admitted that Christina Chakonas was contributorily negligent in closing argument.

¶ 206     A reviewing court will reverse a trial court's determination about which instruction to give, only if the trial court abused its discretion. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002). A trial court has discretion in determining which instructions to give. *Schultz*, 201 Ill. 2d at 273. When deciding whether a trial court abused its discretion, a reviewing court will examine the jury instructions in their entirety, to determine whether they fairly, fully and comprehensively informed the jury of the relevant law. *Schultz*, 201 Ill. 2d at 273-74. Ordinarily, a reviewing court will not reverse a trial court, even if the trial court gave faulty instructions, unless the instructions clearly misled the jury and resulted in prejudice to the appellant. *Schultz*, 201 Ill. 2d at 274.

¶ 207     As noted, the trial court instructed the jury based upon IPI Civil (2006) No. 10.08, as follows:
          "If you decide there is evidence tending to show that the decedent was a person of careful habits, you may infer that [she] was in the exercise of ordinary care for [her] own safety at and before the time of the occurrence, unless the inference is overcome by other evidence. In deciding the issue of ordinary care by the decedent you may consider this inference and any other evidence upon the subject of the decedent's care."
The Notes on Use following IPI Civil (2006) No. 10.08 is instructive:
          "can be given in a negligence or willful and wanton action based on the Wrongful Death Act when there are no witnesses to the occurrence, other than the defendant,

covering the entire period in which the decedent must be in the exercise of ordinary care." IPI Civil (2006) No. 10.08, Notes on Use.

¶ 208    Citing *Plank v. Holman*, 46 Ill. 2d 465 (1970), defendants argue that the trial court abused its discretion in instructing the jury as to Christina Chakonas' careful habits because there were eyewitnesses to the collision. I disagree with defendants' argument for several reasons.

¶ 209    First, I find *Plank* factually distinguishable. In *Plank*, a widow operated a motor vehicle about eight or nine automobile lengths behind a motor vehicle operated by her husband with no vehicles in between. The husband's motor vehicle was struck by another motor vehicle travelling in the opposite direction on a thoroughfare. The issue in that case was which motor vehicle involved in the collision had crossed the center line of the thoroughfare causing the collision. The surviving widow, who was driving behind her husband's motor vehicle, testified that she had clearly observed her husband's motor vehicle during the entire occurrence and observed the entire accident. Our supreme court held that the trial court properly barred evidence regarding the husband's careful driving habits. *Plank*, 46 Ill. 2d at 469-70. Here, there was no testimony regarding the complete movement of the Chakonas vehicle, only incomplete fragments of that movement. Reeves testified that he did not observe the Chakonas vehicle until after impact. Youngreen testified that he observed the Chakonas vehicle stopped at the stop sign, but how the vehicle moved after that is unknown. There was no actual eyewitness to all of the movements of the motor vehicle. Accordingly, the instruction would not be barred under *Plank*.

¶ 210    In *Bitner v. Central Illinois Light Co.*, 75 Ill. App. 3d 715 (1979), the decedent climbed a ladder to paint the top of an oil tank, and came into contact with power lines, which electrocuted him and caused him to fall to the ground. *Bitner*, 75 Ill. App. 3d at 717. The appellate court held that the eyewitness was not competent because he had not observed the actual incident, and it found that the trial court erred in *not* allowing evidence of the decedent's careful habits. *Bitner*, 75 Ill. App. 3d at 720.

¶ 211    In the case at bar, there were eyewitnesses for only some parts of the events leading up to the collision, but no one had observed the entire movement of decedent's vehicle or the impact. Reeves testified that he did not observe decedent's vehicle until after impact, and another witness testified that he observed decedent's vehicle stopped at the stop sign, but did not observe the collision. However, like *Bitner*, no witnesses observed the accident itself. So even under the rule that requires no eyewitness testimony, habit testimony of decedent's careful habits would be admissible in the case at bar.

¶ 212    The salient point is that an eyewitness must actually observe the whole accident in question. This did not occur in the case at bar, so the trial court's admission of evidence about decedent's careful habits and the corresponding jury instruction were not erroneous.

¶ 213    Second, Illinois courts have adopted Federal Rule of Evidence 406 (Fed. R. Evid. 406) regarding the admission of habit and routine practice evidence since *Plank*. In *Alvarado v. Goepp*, 278 Ill. App. 3d 494 (1996), this court in a decision authored by Justice Warren Wolfson noted that adoption. *Alvarado*, 278 Ill. App. 3d at 496 (citing *Hajian v. Holy Family Hospital*, 273 Ill. App. 3d 932, 942 (1995), *Taruc v. State Farm Mutual Automobile Insurance Co.*, 218 Ill. App. 3d 51, 57 (1991), and *Wasleff v. Dever*, 194 Ill. App. 3d 147, 155 (1990)).

¶ 214    In *Hajian*, we found that Rule 406 provides:

"Evidence of the habit of a person or of the routine practice of an organization, *whether corroborated or not* and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." (Emphasis added and internal quotation marks omitted.) *Hajian*, 273 Ill. App. 3d at 942.

Defendant's contention that the presence of an eyewitness precludes the admission of habit testimony is contrary to Rule 406 of the Federal Rules of Evidence and case law. Rule 406 permits habit or custom evidence even if eyewitness testimony is available (*Hajian*, 273 Ill. App. 3d at 942), and that rule was in effect at the time of the trial.

¶ 215 Finally, I do not agree with the majority's decision that plaintiffs' admission in closing argument that Christina Chakonas was contributorily negligent in causing the collision was legally inconsistent with the jury instruction as to Christina Chakonas' careful habits. At trial, there was dispute as to whether Christina Chakonas stopped at the stop sign prior to entering the intersection and the evidence of her careful habits went to establishing that she did stop at the stop sign. The majority does not find that the admission of "careful habits" evidence was improper, but instead finds that the jury instruction should not have been given. When careful habits evidence is properly admitted, it is important that the jury be instructed on how to use that evidence. *Hajian v. Holy Family Hospital*, 273 Ill. App. 3d 932, 943 (1995) ("[s]ince the admission of [habit testimony] was proper, the trial court could exercise its discretion to submit for jury consideration the habit instruction based upon IPI Civil 2d No. 10.08"). In fact, litigants have the right to have the jury instructed on each theory supported by the evidence. *Heastie v. Roberts*, 226 Ill. 2d 515, 543 (2007).

¶ 216 The decision to give or refuse a tendered jury instruction is within the sound discretion of the trial court. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002). A trial court does not abuse its discretion so long as the instructions fairly, fully and comprehensively apprised the jury of the relevant legal principles. *Schultz*, 201 Ill. 2d at 273-74. "Nor can it be presumed that reversal is warranted because the jury was misled by the court's instruction unless there is *some indication* that the jury was improperly influenced." (Emphasis added.) *Foley v. Fletcher*, 361 Ill. App. 3d 39, 50 (2005).

¶ 217 In this case, following the proper admission of habit evidence as to Chakonas, the jury was instructed verbatim from IPI Civil (2006) No. 10.08:

"If you decide there is evidence tending to show that the decedent was a person of careful habits, you may infer that [she] was in the exercise of ordinary care for [her] own safety at and before the time of the occurrence, unless the inference is overcome by other evidence. In deciding the issue of the exercise of ordinary care by the decedent you may consider this inference and any other evidence upon the subject of the decedent's care."

¶ 218 This instruction was appropriate, as it instructed the jury that the habit evidence could be considered by it, but that "any other evidence" should also be considered, and that said "other evidence" could overcome the inference created by the habit evidence. Had the jury not been instructed concerning how to use the properly admitted habit evidence, it would not have any guidance on how, if at all, to consider this evidence. Without instruction, the jury could have ignored all of the careful habit evidence, despite the fact that it was properly admitted, or defendants could just as easily argue that the jurors accepted the habit evidence as conclusive

- 44 -

proof. The given instruction appropriately and accurately explained to the jury how the evidence was to be weighed. *Ready v. United/Goedecke Services, Inc.*, 238 Ill. 2d 582, 591 (2010) ("[i]nstructions convey the legal rules applicable to the evidence presented at trial and thus guide the jury's deliberations" (internal quotation marks omitted)).

¶ 219 Further, even if the trial court erred in giving the careful habits instruction to the jury, the error was harmless. As noted, ordinarily, a reviewing court will not reverse a trial court, even if the trial court gave faulty instructions, unless the instructions as a whole clearly misled the jury and resulted in prejudice to the appellant. *Schultz*, 201 Ill. 2d at 274. I find that the jury instructions as a whole did not clearly mislead the jury. The jury was instructed as to contributory negligence, a theory advanced by defendants, and the jury concluded that Christina Chakonas was 40% contributorily negligent in causing the collision. Based upon the evidence, the jury's allocation of fault was within the permissible bounds of reason and the defendants have failed to show how the careful habits instruction resulted in prejudice which rose to the level of reversible error. Accordingly, any effect on the verdict arising from the careful habits instruction was *de minimus* and does not require a new trial.

¶ 220 In order for the jury to have been confused from the careful habits instruction, the defendants would have to show that they were prejudiced. The attorney for Powell and Kakidas argued during closing arguments that Chakonas was 25% to 35% contributorily negligent. Chakonas's attorney asserted that she was 25% contributorily negligent because she "should not have attempted to cross that street until the truck had passed." The careful habits argument was limited to whether she had stopped at the stop sign before making her left turn. The defense argued that Chakonas was the sole cause of the accident or was over 50% contributorily negligent. There was no confusion because the jury found her 40% contributorily negligent. It is the position of the majority that the jury "may well have" found a greater degree of fault against Chakonas if the instruction was not given. However, the "proof is in the result." If the jury had found that Chakonas was less than 25% contributorily negligent, that would have been proof that the jury was confused. But when the majority concludes that the jury "may well have" found more than 40% contributory negligence, they are guessing. There is no evidence that this jury was confused and its verdict should not be disturbed. The majority has not demonstrated how the trial court abused its discretion.

¶ 221 III. The Burden of Proof Instructions Regarding Agency

¶ 222 Dean Foods argues and the majority finds that the trial court's failure to instruct the jury as to the burden of proof regarding agency denied it a fair trial.

¶ 223 The trial court gave the jury the following burden of proof instruction regarding plaintiffs' agency claims against Dean. Utilizing IPI Civil (2006) Nos. 50.03, 50.10, and 72.04, the trial court instructed the jury as follows:

> "Defendants, Dean Foods Company, Alco [of Wisconsin], Inc., Alder Group, Inc. are sued as the principal and the Defendant Jaime Reeves as their agent. Dean Foods Company denies that any agency existed.
>
> If you find that Defendant Jaime Reeves was the agent of the Defendant Dean Foods Company at the time of the occurrence and if you find Jaime Reeves is liable, then all Defendants are liable.

* * *

If you find that Jaime Reeves is not liable, then no Defendant is liable.

* * *

The question has been raised whether at the time of the occurrence Jaime Reeves was the agent of the Defendant Dean Foods Company or was an independent contractor. An agent is a person who by agreement with another, called a principal, represents the principal in dealings with third persons or transacts some other business, manages some affair, or does some service for the principal, with or without compensation. The agreement may be oral or written, expressed or implied. The term 'agent' is broader than either 'servant' or 'employee.' A servant or employee is an agent, but one may be an agent although he is neither a servant nor an employee.

If you find that one person has a right to control the actions of another at a given time, you may find that the relation of principal and agent exists, even though the right to control may not have been exercised.

An independent contractor is one who undertakes a specific job where the person who engages him does not have the right to discharge him or to direct and control the method and manner of doing the work.

In determining whether at the time of the occurrence Jaime Reeves was the agent of the defendant Dean Foods Company or was an independent contractor, you may consider the method of payment; the right to discharge; the skills required and the work to be done; who provides the tools, materials and equipment; whether the worker's occupation is related to that of the employer; and whether the employer deducted for withholding tax.

The principal is liable to third persons for the negligence of his agent in the transaction of the business of the principal, if the agent himself is liable. The one who engages an independent contractor is not liable to others for the negligence of the contractor."

¶ 224     Dean Foods objected to the above instructions pertaining to plaintiffs' agency claims, claiming that the instructions did not adequately inform the jury that plaintiffs had the burden of proof with regard to establishing agency against Dean, and tendered the following instruction to the trial court:

"If you find that the plaintiffs have proved the propositions required of them as to Jaime Reeves, Alder Group, Inc., and Alco of Wisconsin, Inc., you must then determine whether Jaime Reeves was an agent of Dean Foods [Company].

If you find from your consideration of all the evidence that the plaintiffs have not proved that Jaime Reeves was an agent of Dean Foods [Company], then your verdict should be for Dean Foods [Company].

If you find that plaintiffs have proved each of the propositions they are required to prove against Jaime Reeves, Alder Group, Inc., and Alco of Wisconsin, Inc., and have further proved that Jaime Reeves was the agent of Dean Foods [Company], then your verdict should be for the plaintiffs and against Dean Foods [Company]."

The trial court refused Dean's tendered instruction finding that the "If you find" language contained in IPI Civil (2006) No. 50.10 was sufficient to instruct the jury as to the burden of proof regarding the agency claims against Dean Foods Company.

¶ 225     However, the jury instructions, when considered as a whole, fully and fairly advised the jury with respect to the burden of proof, because IPI Civil (2006) No. 21.01 advises the jury that anytime the expression " 'if you find' " or " 'if you decide' " is used, it means that the jury has to be persuaded on that point by a preponderance of the evidence.

¶ 226     IPI Civil (2006) No. 21.01 states as follows:

"When I say that a party has the burden of proof on any proposition, *or use the expression 'if you find,' or 'if you decide,'* I mean you must be persuaded, considering all the evidence in the case, that the proposition on which he has the burden of proof is more probably true than not true." (Emphasis added.)

¶ 227     Again, "[t]he trial court has discretion to determine which instructions to give the jury and that determination will not be disturbed absent an abuse of that discretion." *Schultz*, 201 Ill. 2d at 273. The majority has not demonstrated how the trial court abused its discretion. The majority writes that there was no direct evidence of agency and that's why the burden of proof instruction was so important. "Direct evidence has been defined as evidence which, if believed, proves the existence of the fact in issue without inference or presumption ***." *People v. Christiansen*, 118 Ill. App. 2d 51, 56 (1969). "Direct evidence has been described as testimony of a person who has perceived the existence of a fact, sought to be proved or disproved, by means of his senses." *Christiansen*, 118 Ill. App. 2d at 56. Documents can also be direct evidence. *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 70 (2009) (holding that "settlement documents are direct evidence of fraud").

¶ 228     The direct evidence of agency is overwhelming in this case. However, the issue here has nothing to do with the evidence that was admitted, the issue is whether the trial court abused its discretion in refusing Dean Foods' burden of proof instruction.

¶ 229     The direct evidence showed by testimony that Dean Foods had the right to control the actions of Alder/Alco's drivers. *Supra* ¶ 69. At the time of the collision, the relationship between Dean Foods and Alder/Alco had been in place for 60 years, and Alder/Alco "pulled" exclusively for Dean Foods. In 2000, Alder received the "Partners in Distribution Award" from Dean Foods. White, "Alder and Alco's" assistant safety director and driver trainer at the time of the collision, testified that he used letterhead that bore Dean Foods' insignia with the notation "distributor of Dean Foods" in the performance of his job, including the reprimand of drivers. The "Alder Companies Driving Manual," which was admitted into evidence without objection, states that Alder/Alco drivers were part of Dean Foods' fleet and instructs the drivers to wear Dean Foods clothing and act in a manner that will encourage positive opinions about Dean Foods. In particular, the manual states "When you step out of your truck, you are immediately recognized as DEAN FOODS." Perhaps most importantly, Dean Foods owned the loaded trailer which Reeves was "pulling" at the time of the collision. *Supra* ¶ 69. In addition, the trucks bore Dean Foods' insignia.

¶ 230     Since the majority cannot show us how the jury was confused with the instructions they received, it cannot be said that the trial court abused its discretion in denying Dean Foods'

tendered instruction. Even if the trial court abused its discretion in denying Dean Foods' instruction, that denial could never rise to the level of denying them a fair trial.

¶ 231    For the reasons that I have stated, I must respectfully dissent, and I would affirm the judgment of the trial court.